# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA 02 SEP -4 AM 9: 30
### ORLANDO DIVISION

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

BOOKER PERRY, JAMES JACKSON,
STACY McLEAN, TERRY HAWKINS,
ROBSON SUAREZ, and JUAN BAQUERO,

     **Plaintiffs,**

-vs-             **Case No. 6:01-cv-208-Orl-22KRS**

ORANGE COUNTY and ORANGE
COUNTY PROFESSIONAL FIRE
FIGHTERS LOCAL 2057,
INTERNATIONAL ASSOCIATION OF
FIRE FIGHTERS,

     **Defendants.**

---

# ORDER

## I. INTRODUCTION

  This lawsuit arises from a dispute over a promotional examination administered in 1999 for the position of fire lieutenant in the Orange County Fire and Rescue Division ("FRD"). The Plaintiffs, who are African American and Hispanic firefighters or engineers,[1] did not pass the first three components of the test and, consequently, did not qualify for promotion. In their Complaint (Doc. 1), they advance the following claims against the firefighters' union, Orange County Professional Firefighters Local 2057, International Association of Firefighters ("the Union" or "Local 2057"): intentional race discrimination in violation of 42 U.S.C. § 1981 (Count I), race-based disparate treatment in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Count II), disparate impact based on race in contravention of Title VII (Count III), and retaliation under Title VII (Count IV). Plaintiffs

---

[1]An exception is Robson Suarez, whom the Court has determined is not Hispanic. *See* § IV.A *infra.*

also seek to hold Orange County liable under their disparate impact theory; the County is thus named in Count III of the Complaint.[2]

Upon considering the parties' summary judgment submissions, and after conducting a *Daubert*[3] hearing concerning admissibility of proposed expert opinion evidence, the Court determines that Orange County and Local 2057 are entitled to summary judgment on all of the Plaintiffs' claims.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United American Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Administrator U. S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds,* 30 F.3d 1347 (11th Cir. 1994), *cert. denied,* 513 U.S. 1110 (1995)). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen,* 83 F.3d at 1349. The Court considers the evidence and all inferences drawn therefrom in the light most favorable to the non-moving party. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993), *reh'g and reh'g en banc denied,* 16 F.3d 1233 (11th Cir. 1994).

---

[2]Plaintiffs initially named Orange County in Counts I, II and III of the Complaint. However, on May 28, 2002, Plaintiffs and the County filed a Joint Agreement Dismissing Plaintiffs' Disparate Treatment Claims (Counts I and II) With Prejudice (Doc. 69). The Court approved this stipulation on June 25, 2002. *See* Doc. 80.

[3]*Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).*

AO 72A
(Rev.8/82)

## III. BACKGROUND

The following is a general outline of the background of this case. Where pertinent, further discussion of the facts is contained in the analysis section of this Order. Most of the facts set forth in this section are derived, verbatim in some instances, from the stipulated facts section of the Amended Joint Pretrial Statement. *See* Doc. 101, § IX.A., at 24-26.

Booker Perry, Stacy McLean and Terry Hawkins are African American firefighters employed in Orange County's FRD.[4] James Jackson is an African American formerly employed as a firefighter in the FRD. Juan Baquero is a Hispanic engineer employed in the FRD.[5] Robson Suarez, also an engineer in the FRD, is alleged in the Complaint to be Hispanic. Perry and McLean are also EMTs; Jackson and Hawkins are also paramedics.

All of the Plaintiffs are members of Local 2057.[6] The Union is the exclusive bargaining agent on behalf of the Plaintiffs for collective bargaining purposes with the County.

The firm of Burroughs and Rockhill, Inc., designed the 1999 lieutenant's examination. Twelve members of the FRD served as Subject Matter Experts ("SMEs") to assist Burroughs and Rockhill in designing the test. One of the SMEs was Mark Rhame, then President of the Union. The test was comprised of four components. Components 1-3 consisted of a written job knowledge examination, a structured response tactical exercise, and a structured response in-basket exercise. Component 4

---

[4] The Complaint also names as a plaintiff African American firefighter James Jackson, who is no longer employed by Orange County. On June 28, 2002, Plaintiffs and the County filed a Joint Stipulation Dismissing Plaintiff James Jackson's Claims With Prejudice (Doc. 82). Jackson's claims against the Union remain pending.

[5] The Amended Joint Pretrial Statement states that Baquero is an engineer. *See* Doc. 101, § IX.A., ¶ 6, at 24. The Complaint alleged that Baquero was a firefighter/paramedic, not an engineer. *See* Doc. 1, ¶ 7, at 3. This potential discrepancy is immaterial to resolution of this case.

[6] However, Booker Perry was not admitted to the Union until after the dispute concerning the lieutenant's test arose.

AO 72A
(Rev.8/82)

was an interactive (real time) role play exercise. Only those candidates who passed Components 1-3 could proceed to Component 4.

The first three components of the lieutenant's exam were administered to 133 candidates on October 11 and 12, 1999. The parties have stipulated to the following information concerning test results:

> Based on information compiled as of December 1999, of the 116 Whites that took the test, 59 passed the first three components of the test and moved on to the fourth component. Of the 17 African Americans and Hispanics that took the first three components of the test, one African American passed.

Amended Joint Pretrial Statement (Doc. 101), § IX.A., ¶ 17, at 25. However, as will be seen from § IV.A. *infra,* there is an issue as to whether one of the persons classified as Hispanic, Plaintiff Robson Suarez, is actually Hispanic, as well as whether a Hispanic person previously classified as white passed Components 1-3.

Booker Perry filed an internal grievance, protesting the examination, on December 23, 1999. On March 28, 2000, the grievance was finally denied at the third step by the Grievance Adjustment Board. The grievance was not pursued to the fourth step, arbitration; the reason it was not is disputed. Perry filed an EEOC charge against the County on March 3, 2000, contending that the 1999 lieutenant's exam was racially discriminatory. James Jackson filed an EEOC charge against the Union on August 8, 2000, claiming the lieutenant's test was racially discriminatory and further asserting that Local 2057 retaliated against Booker Perry by not admitting him into the Union after he filed his EEOC charge against the County.

-4-

In February 2000, Perry applied for Union membership. His application was tabled initially, and was tabled again in March and April 2000. Perry was not admitted into the Union until the following year.

## IV. ORANGE COUNTY'S MOTION FOR SUMMARY JUDGMENT

### A. Claims of Robson Suarez

Orange County seeks summary judgment against Robson Suarez on the basis that Suarez is not actually Hispanic. To support this argument, the County relies on the following deposition testimony provided by Suarez:

> Q: And just for the purposes of the record, what is your race?
>
> A: Well, I am what you say a white Brazilian. But here, I'm considered Hispanic, for some reason. My language is not Spanish. So in the United States, for some reason, they categorize everybody.
>
> Q: Well, what do you consider yourself, as far as your race?
>
> A: You know, it's weird. I mean, I don't know what I consider myself. I'm not Hispanic, because I don't speak Spanish. I speak Portuguese. So that's my native language. So I don't know. I consider myself a living, breathing human, that's it. I don't care. I'm not an African-American. I'm not Asian. I'm not Hispanic, but everybody considers South American being Hispanic. And it's not all South Americans that are Hispanic. We are of Portuguese decendency [sic]. So we're all mixed right now.[7]

Doc. 32, ¶ 35, at 13 (emphasis deleted; footnote added).[8]

---

[7]On the second day of his deposition, Suarez testified that he was perceived as Hispanic by "everybody" at the County "[b]ecause of the color of the skin, because the way I talk, and the accent." Doc. 46 at 126. Although he characterized himself as "white non-American,"he expressed the opinion that in the United States, he is characterized as "Hispanic for all purpose[s]." *Id.* at 128.

[8]The above-quoted passage is derived from Orange County's Motion for Summary Judgment (Doc. 32), which cites as its source pp. 7-8 of Suarez's deposition transcript. It is necessary to rely on the County's quote because page 8 is missing from the transcript of Suarez's deposition filed in this case. *See* Doc. 45.

AO 72A
(Rev.8/82)

Plaintiffs counter that Suarez in fact is Hispanic, stating:

> [A]ccording to EEOC definition. any person is Hispanic is [sic] they are of South American origin, regardless of race. (See Peightal v. Metropolitan Dade County, 26 F.3d 1545[,] 1551 (11th Cir. 1994).) In fact, SUAREZ is a speaker of Portuguese, the native language of Brazil. Because SUAREZ is from Brazil, which is in South America, and has a [sic] strong family ties and cultural and linguistic ties with Brazil, he is considered Hispanic under the EEOC guidelines, even though his native language is Portuguese. (See id. at pages 1551, 1559)[.]

Doc. 70 at 5.

In *Peightal*, the Court of Appeals for the Eleventh Circuit approved Dade County's use, in an affirmative action plan, of the definition of "Hispanic" contained in EEOC guidelines. 26 F.3d at 1559-61. The EEOC's definition of "Hispanic" included: "All persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race." *Id.* at 1559. However, it was important to the Eleventh Circuit that the EEOC (and Dade County) also applied the following "limiting guideline" to this definition: "a person's claim of identification with a certain racial or ethnic group 'should accompany strong visible indication that the person *culturally* and *linguistically* identifies with the group he or she claims.'" *Id.* at 1559 (emphasis in original quote of EEOC guideline).

Perhaps most significant for present purposes, it is clear from the *Peightal* opinion that Dade County did not interpret its plan as including "Brazilians of Portuguese descent" within the definition of Hispanic. *Id.* at 1561. In that regard, the appellate court stated:

> Peightal also attacks the Plan as under-inclusive, arguing that it benefits those of Spanish descent, while excluding, and therefore discriminating against, persons of other European national origin. Peightal claims that Brazilians of Portuguese descent, Greeks, Jews, Italians, and Iranians are culturally and linguistically discernable, and

-6-

may have suffered similar discrimination, but have been denied benign preference in hiring by Metro Dade's Plan. Peightal also asserts that it is logically inconsistent to deny Brazilians of Portuguese origin hiring preference while according such a preference to Brazilians of Spanish origin. Peightal has not offered evidence or pointed to evidence submitted by Metro Dade to support an assertion that prior discrimination exists against the groups he has identified. Absent such evidence, implementation of race-conscious relief in favor of such groups would have violated the teachings of [*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989)]. Indeed, Peightal has not proffered any evidence in support of his illustrations of underinclusiveness. Accordingly, we hold that the Plan is not under-inclusive.

26 F.3d at 1561 (footnotes omitted).  Hence, the *Peightal* panel essentially determined that a proper interpretation of the EEOC's definition of Hispanic, as limited by the requirement of strong visible indications of cultural and linguistic identification with the group, excludes Brazilians of Portuguese descent absent evidence of prior discrimination against such group.  Plaintiffs have offered no such evidence.  Accordingly, on the present record, and particularly given the fact that Suarez considers himself white, this Court finds a matter of law that Suarez is not Hispanic.

## B. Claims of Juan Baquero

Orange County also maintains that Juan Baquero cannot "piggyback" onto the EEOC discrimination charges filed by his African-American co-Plaintiff, James Jackson.[9] The County argues that Baquero's claim of discrimination based on his Hispanic status is sufficiently different from Perry's claim to preclude application of the single-filing rule.

"No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." *See Alexander v. Fulton County, Ga.*, 207

---

[9]The County's argument in this regard directed at Suarez is mooted by the Court's determination that Suarez is not Hispanic and, accordingly, is not entitled to proceed in this suit.

AO 72A
(Rev.8/82)

F.3d 1303, 1332 (11th Cir. 2000) (citing 42 U.S.C. § 2000e-5). However, "under the so-called 'single-filing rule,' if one plaintiff, in a multi-plaintiff, non-class action suit, has filed a timely EEOC complaint as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement." *Alexander,* 207 F.3d at 1333 (citations and case quotation marks omitted). In other words, "[a] plaintiff who has *not* filed an individual EEOC charge may invoke the single-filing rule where such plaintiff is similarly situated to the person who actually filed an EEOC charge, and where the EEOC charge actually filed gave the employer notice of the collective or class-wide nature of the charge." *Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 558 (11th Cir. 1997) (emphasis in original).[10]

In the instant case, Plaintiffs' disparate impact claim is founded on the notion that the 1999 lieutenant's promotional exam unfairly impacted both African-American and Hispanic test-takers. Accordingly, Perry expressly noted in his two EEOC charging forms that he was filing his complaints of discrimination for himself and "for other similarly situated black/African-American & Hispanic firefighters," and complained about the lieutenant's test relative to both blacks and Hispanics. Doc. 1, Exhibits "A" & "B."

Given these circumstances, the Court determines that the Baquero is sufficiently similarly situated with Perry that Baquero may piggyback onto Perry's EEOC charges. Unquestionably, the EEOC charges filed by Perry gave Orange County notice of the "collective nature" of the claimed

---

[10]The *Gitlitz* court went on to state: "However, where a plaintiff has filed an individual EEOC charge, such a plaintiff should be required to rely upon his or her own EEOC charge, and cannot reasonably rely upon the other claimant's charge." 129 F.3d at 558.

discrimination, i.e., that the lieutenant's examination had a disparate impact on Hispanics as well as African-Americans.

### C. Disparate Impact Claim

"In a disparate impact case, the plaintiff has the initial burden of establishing a prima facie case by showing that the employment practices complained of 'select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants.'" *Nash v. Consolidated City of Jacksonville, Duval County, Fla.,* 895 F. Supp. 1536, 1541 (M.D. Fla. 1995) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)), *aff'd*, 85 F.3d 643 (11th Cir. 1996). "The burden then shifts to the employer to demonstrate that the tests are 'job related.' *Id.* (quoting *Albemarle Paper*). "The plaintiff then has the opportunity to show that 'other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in "efficient and trustworthy workmanship,"' which would be 'evidence that the employer was using its tests merely as a "pretext" for discrimination.'" *Id.* (quoting *Albemarle Paper*).

To reiterate, the parties have stipulated as follows: "Based on information compiled as of December 1999, of the 116 whites that took the test, 59 passed the first three components of the test and moved on to the fourth component. Of the 17 African Americans and Hispanics that took the first three components of the test, one African American passed." Doc. 101, § IX.A., ¶ 17, at 25.[11]

---

[11] These figures assume that Plaintiff Robson Suarez is Hispanic. However, as previously determined, he is not. Ordinarily, this would drop the number of Hispanic candidates to 6 and increase the number of whites to 117. However, Orange County is now taking the position that a candidate previously identified as white who passed the test, Robert Reineke, is actually Hispanic. *See* Orange County's Trial Brief (Doc. 95), ¶ 78, at 15. If this is true, Suarez and Reineke would simply switch categories; the number of white test-takers would remain at 116 and the sample size for Hispanics would stay at 7. However, if Reineke is Hispanic, the passage figures change to 58 whites, 1 black and 1 Hispanic. Plaintiffs' expert witness's opinions concerning the statistical significance of Hispanic passage rates is based on the assumption that no Hispanic passed the test.

AO 72A
(Rev.8/82)

It is evident from this data that the passage rate for blacks and Hispanics, considered collectively or as separate groups, is less than 80% of the passage rate for whites. The 80% figure is relevant because "a selection rate that is less than 4/5, or 80%, of the rate for the group with the highest rate" may be considered "an indication of significant adverse impact." *Nash,* 895 F. Supp. at 1542 (citing "four-fifths rule" set forth in EEOC regulation 29 C.F.R. § 1607.4D). Orange County nevertheless seeks summary judgment on the disparate impact claim on the basis that the sample size for blacks and Hispanics is too small to be statistically significant and, in any event, it is improper to combine both groups for sample size purposes.

Certainly, a sample size can be too small to have probative value. *See Nash,* 895 F. Supp. at 1542-43 ("A statistical pool of only two African-American test takers is too shallow for the Court to dive into with a disparate impact analysis."). In the instant case, Plaintiffs' expert witness, Dr. Paul J. Hoffman, has rendered an opinion that the pass rate comparisons in the instant case "are clearly statistically significant." Notes re: Fire Lieutenant Promotional Examination, OCFRD ("Hoffman Report"), attachment "O" to Doc. 33, at 2. Referring to tables attached to his report, Hoffman states:

> Table 1 presents data comparing the pass rates of African-American and Hispanic firefighters (combined) to the pass rates of White firefighters. These results are clearly statistically significant, by Chi-Square, (p=.0005), by Fisher's Exact Test, (p=.0003), and by the 80% rule (5.9%/50.8%=11.6%[)].

> Table 2 presents data comparing the pass rates of African-American firefighters to the pass rates of White firefighters. These results are clearly statistically significant, by Chi-Square (p=.013), by Fisher's Exact Test (p=.013), and by the 80% rule (10%/50.8%=19.7%[)].

> Table 3 presents data comparing the pass rates of Hispanic firefighters to the pass rates of White firefighters. The results are clearly statistically significant, by Chi-Square (p=.009), by Fisher's Exact Test (p=.009), and by the 80% rule (0.0%/50.8%=0.0%[)].

-10-

*Id.*

As a result of concerns about the sample size, grouping, and other expert opinion issues, the Court conducted a *Daubert* hearing on August 26, 2002. Prior to the hearing, the Court directed the parties to file materials supporting their expert witness's proposed testimony and opposing the admission of their opponent's expert. The parties complied. *See* Docs. 115 & 123 (Plaintiffs' submissions) and Docs. 116-118 & 122 (Orange County's filings).

At the *Daubert* hearing, Plaintiffs' counsel presented argument and relied on the expert reports prepared by Dr. Hoffman and Hoffman's deposition.[12] Dr. Hoffman did not testify. Orange County, on the other hand, not only relied on its prior submissions (including the report and deposition testimony of its expert, Dr. Barrett), but also called Dr. Barrett to testify. The Court was persuaded by the evidence presented at the *Daubert* hearing that Dr. Hoffman's expert opinions concerning this case are not reliable.

Under *Daubert*, "trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.,* - F.3d -, 2002 WL 1669832 * 2 (11th Cir. Jul. 24, 2002) (No. 01-16209). The proponent of expert testimony bears the burden of showing that the expert is qualified to testify competently concerning the matters at issue, that the expert's methodology is sufficiently reliable, and the testimony would assist the trier of fact. *Id.* Plaintiffs have not met this burden with respect to Dr. Hoffman.

Regarding the issue of combining African Americans and Hispanics to obtain a larger sample size, this Court recognizes that the Court of Appeals for the Eighth Circuit has stated that combining

---

[12]Plaintiffs' counsel also cross-examined Dr. Barrett, the County's expert witness.

AO 72A
(Rev.8/82)

minorities for purposes of sample size is appropriate if a court is examining a test's impact on all minorities. *See Mems v. City of St. Paul, Dept. of Fire and Safety Services,* 224 F.3d 735, 740 (8th Cir. 2000). However, Plaintiffs have not presented any justification, such as cultural differences, for combining African Americans and Hispanics in this particular case. Absent any rationale for combining the two groups, it makes just as much sense to include in the "minorities" sample another historically-disadvantaged category - women - whose passage rate on the lieutenant's test was 50% (the same as whites in general). Accordingly, in the case at bar, Plaintiffs have not demonstrated that it is appropriate to group blacks and Hispanics. This leaves sample sizes of 10 African Americans and 6 or 7 Hispanics.

In his expert report and through live testimony, Dr. Barrett has demonstrated that these sizes are not sufficiently large to yield statistically significant results concerning disparate impact. In that regard, Dr. Barrett has shown that these samples are so small that slight numerical variations yield dramatic changes. *See* Preliminary Expert Report of Gerald V. Barrett, Ph.D., J.D. ("Barrett Report") (Composite Exhibit 1 to Barrett Deposition (Doc. 118)) at 46-50. Dr. Barrett has also shown that Dr. Hoffman failed to properly take into account the potential impact of failure to study for an examination when dealing with such small sample sizes. Hence, the Court finds Dr. Hoffman's opinions concerning disparate impact to be unreliable; they would not assist the trier of fact. In the absence of Dr. Hoffman's opinion concerning disparate impact, Plaintiffs are unable to establish a *prima facie* case.[13]

---

[13]*Nash* indicates that when a plaintiff is unable to establish a *prima facie* case based on statistics alone, she may nevertheless satisfy her burden by presenting proof of a "pattern of past racial discrimination." *See* 895 F. Supp. at 1543. Although the Plaintiffs in the instant case allege a history of discrimination against blacks and Hispanics within the FRD, they have presented no proof to support that allegation.

AO 72A
(Rev.8/82)

Assuming Plaintiffs had been able to make out a *prima facie* case, the County would still be entitled to summary judgment on the issues of test validity and alternate selection measures. Again, Dr. Hoffman's opinions in this area lack reliability, have no basis in the scientific literature, and amount to no more than speculation.[14]

Since the success of Plaintiffs' disparate impact claim is dependent upon Dr. Hoffman's expert opinions, and those opinions are inadmissible under *Daubert*, the County is entitled to summary judgment on that claim.[15]

## IV. LOCAL 2057'S MOTION FOR SUMMARY JUDGMENT

### A. Whether Union is a "Labor Organization" Covered by Title VII

Local 2057 maintains that it cannot be held liable under Title VII because it is not a "labor organization" within the meaning of 42 U.S.C. § 2000e(d).

A "labor organization" is defined under Title VII as "a labor organization engaged in an industry affecting commerce[.]" 42 U.S.C. § 2000e(d). Insofar as relevant to the instant dispute, a labor organization is

> (e) deemed to be engaged in an industry affecting commerce if . . . (2) the number of its members . . . is . . . (B) fifteen or more . . . , and such labor organization -
>
> * * *
>
> (2) . . . is . . . a local labor organization recognized or acting as the representative of employees of an

---

[14]This is not the first time a federal court has criticized Dr. Hoffman's expert opinions. *See Rudder v. District of Columbia,* 890 F. Supp. 23, 30-31 (D.D.C. 1995) (severely criticizing Dr. Hoffman's testimony and noting "his readily apparent and extreme bias"), *affirmed,* 99 F.3d 448 (D.C. Cir. 1996).

[15]The Court rejects Plaintiffs' counsel's complaint that Dr. Hoffman was not afforded an opportunity to respond to Dr. Barrett's testimony about Dr. Hoffman's opinions and methodology. The short answer to that objection is that Plaintiffs could have called Dr. Hoffman as a witness at the *Daubert* hearing, but they did not. For whatever reason, Dr. Hoffman did not appear.

-13-

> employer or employers engaged in an industry affecting commerce[.]

42 U.S.C. § 2000e(e). The phrase "industry affecting commerce" is defined as

> any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C.A. § 401 et seq.], and further includes any governmental industry, business, or activity.

42 U.S.C. § 2000e(h).

It may be true, as the Union states, that it "cannot be deemed to be engaged in an industry affecting commerce and thus subject to Title VII merely by virtue of the fact that it represents employees of a . . . governmental entity." Doc. 58 at 2 (quoting holding in *E.E.O.C. v. California Teachers' Ass'n., 534 F. Supp. 209, 217 (N.D. Cal. 1982)). However, as Plaintiffs note, Local 2057 may nevertheless qualify as a labor organization if it represents those who work for an employer engaged in an "industry affecting commerce," § 2000e(e)(2), i.e., "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce," § 2000e(h). *See California Teachers' Ass'n.*, 534 F. Supp. at 218 (stating one of ways EEOC could prove that teachers association was engaged in industry affecting commerce would be to show, pursuant to § 2000e(e)(2), that employers of association members (school districts) were engaged in an industry affecting commerce).

In an effort to present proof satisfying § 2000e(e)(2) and (h), Plaintiffs rely on the affidavit of Booker Perry. In pertinent part, Perry's affidavit states:

> As part of my duties with the Orange County Fire Rescue Division, I, and other units within the COUNTY, respond to emergency calls at businesses that do business throughout the United States and the world.

-14-

> As such, if the Fire Rescue Division did not perform its duties, the free flow of interstate commerce would be severely disrupted.

Doc. 78, ¶ 3, at 2. Plaintiffs cite to no other evidence, and to no decisional authority supporting the proposition that this conclusory presentation is sufficient to meet the "industry affecting commerce"requirement.

At first blush it might seem obvious that, as a general proposition, fire departments do engage in activities affecting interstate commerce. However, things are not always as simple as they first appear. Consider, for example, *United States v. Laton,* 180 F. Supp. 2d 948 (W.D. Tenn. 2002). In that case, the defendant "was charged with maliciously damaging and destroying the building known as the Henning Fire Station by means of fire[,]" in violation of 18 U.S.C. § 844(i). 180 F. Supp. 2d at 948-49. In pertinent part § 844(i) provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce *or in any activity affecting interstate or foreign commerce* shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both[.]

(emphasis supplied).

The defendant moved to dismiss on the asserted basis that the indictment did not contain allegations satisfying the interstate commerce element of § 844(i). The parties stipulated to a number of detailed facts concerning the activities of the Henning Fire Department, including, *inter alia*, that the department purchased supplies and certain equipment from out-of-state vendors; had sent parts to an out-of-state vendor for maintenance and repair work (the transaction was specified); was responsible for providing, and had actually provided, emergency services at a rest area and at the scenes of vehicle accidents/fires along a particular U.S. Highway, as well as at several specified

-15-

AO 72A
(Rev.8/82)

businesses and public buildings; and had directly billed certain out-of-state insurance companies for fire services performed outside the city limits. 180 F. Supp. 2d at 949 & n.1.

Addressing these stipulated facts, the district judge initially determined that "the Henning Fire Station clearly was not used in interstate commerce," then remarked:

> [M]ost of the facts to which the parties stipulate involve the purposes of the Henning Fire Department, not the Henning Fire Station. As such, the best argument the Government can make is that the Henning Fire Station was used in an activity which substantially affects interstate commerce. In other words, the court must determine whether the Henning Fire Station was used in the activities of the Henning Fire Department, and whether those activities substantially affect interstate commerce.

*Id.* at 951. The district court analyzed the stipulated facts and determined they were insufficient to satisfy the interstate commerce requirement. Particularly relevant to the case at bar, the *Laton* court observed that "[s]ervicing businesses which are linked to interstate commerce" is a "passive connection[] to commerce."[16] *Id.* at 952. Accordingly, the district court granted the defendant's motion to dismiss.

*Laton* casts doubt on the proposition that a fire department's mere provision of services to businesses linked to interstate commerce qualifies it as an employer engaged in an industry affecting commerce. Yet, this is the very basket in which Plaintiffs have placed all their eggs. However, it is unnecessary for this Court to decide whether *Laton*'s rationale is dispositive of this issue. Even if some quantum of evidence could raise a genuine issue of material fact concerning whether the local provision of fire and rescue services to national and international businesses satisfies the "affecting commerce" requirement, the Plaintiffs here have fallen woefully short of the mark. Their presentation

---

[16]The district court said the same thing about "purchasing equipment which has traveled through interstate commerce." *Id.* at 952.

AO 72A
(Rev.8/82)

is wholly conclusory; they have not identified a single such business to which Orange County's Fire Rescue Division has provided emergency services. The Court of Appeals for the Eleventh Circuit "'has consistently held that conclusory allegations without specific supporting facts have no probative value.'" *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985)). Because Plaintiffs have failed to present any specific proof that Local 2057 is a labor organization engaged in an industry affecting commerce, the Union is entitled to summary judgment on Plaintiffs' Title VII claims.

### B. Disparate Treatment Under Title VII and § 1981

Plaintiffs' disparate treatment claims are comprised of two allegations: (1) that the Union's advocacy of an 8-year time in grade requirement in order for firefighters to be eligible to take the lieutenant's test was motivated by a desire to reduce the number of minorities who could satisfy that experience requirement and thereby compete for that promotion, and (2) that the Union discriminatorily refused to pursue arbitration against the County of Plaintiffs' grievances concerning the lieutenant's test.

Preliminarily, the Court must determine whether Plaintiffs have standing to complain about the 8-year service rule for lieutenant eligibility. The Court concludes they do not. All of the Plaintiffs met the time-in-grade requirement. As a result, they cannot show they have personally been injured by the 8-year rule. Accordingly, they lack standing to attack the time-in-grade requirement. *See Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 898 (5th Cir. 1978) (plaintiffs who satisfied 10th grade education requirement did not have standing to challenge that requirement), *cert. denied,* 439 U.S. 835 (1978); *see also Griffin v. Dugger,* 823 F.2d 1476, 1483-84 (11th Cir. 1987) (plaintiff who met educational and testing requirements of road prison correctional officer and who had been hired

-17-

for position suffered no injury as a result of employer's use of written entry-level examination; citing *Payne*), *cert. denied,* 486 U.S. 1005 (1988).[17] The Union is therefore entitled to summary judgment on the disparate treatment claims founded on the 8-year service rule.[18]

Even if the Plaintiffs did have standing to challenge the 8-year requirement, the Union would nevertheless be entitled to summary judgment with respect to that issue. In order to prevail on their claim concerning the service requirement, Plaintiffs must present evidence sufficient to permit a reasonable jury to conclude that the Union was motivated by racial animus when it advocated that rule. In that regard, Plaintiffs and the Union have agreed in the final pretrial statement: "To prove that the UNION violated Title VII by failing to properly represent the Plaintiffs, they must show that the UNION violated the duty of fair representation *and that the UNION was motivated by racial animus.*" Doc. 101, § X.A., ¶ 2, at 26 (emphasis supplied). Discriminatory intent is, of course, also a requirement for success on a § 1981 claim. *See Nash v. Consolidated City of Jacksonville, Duval County, Fla.,* 895 F. Supp. 1536, 1541 (M.D. Fla. 1995) ("liability cannot be imposed under section

---

[17] In an effort to counter the Union's standing argument, Plaintiffs cite *Gray v. Greyhound Lines, East,* 545 F.2d 169 (D.C. Cir. 1976). However, *Gray* is distinguishable. In that case, the appellate court determined that a disputed issue of fact existed concerning whether a plaintiff who had actually been selected for employment on his first application nevertheless had standing to assert failure-to-hire claims. This was because the plaintiff presented the following evidence, through affidavits and deposition testimony:

> by improperly restricting the number of blacks hired Greyhound's policies rendered those blacks who were employed vulnerable to arbitrary discipline, discriminatory treatment in assignment of routes and equipment, and inadequate representation by the union. He also claimed that the isolation he felt as a result of being one of the favored blacks who had slipped through the allegedly discriminatory screening practices adversely affected his mental state.

545 F.2d at 173 & n.13. The defendants in *Gray* did not attempt to controvert this evidence. *Id.* at 175. In the instant case, by contrast, in that portion of their summary judgment response which addresses standing, Plaintiffs have identified no evidence of hostile work environment or psychological injury *relating to the 8-year experience requirement. See* Doc. 73 at 7-8.

[18] Insofar as Plaintiffs also assert a disparate impact claim based on the 8-year rule, they lack standing to raise that claim based on the foregoing rationale.

-18-

1981 without proof of intentional discrimination"). The Plaintiffs have failed to identify any evidence which would support a reasonable jury verdict of racial animus.

Prior to 1999, only engineers could sit for the lieutenant's examination. The Union's then-President, Mark Rhame, recommended that the engineer requirement be eliminated during negotiations with the County to reach a new collective bargaining agreement. *See* Rhame Affidavit (attached to Doc. 61), ¶ 12, at 6. He did so because he "thought it would open up the test to substantially more candidates, something the engineer requirement prevented." *Id.* According to Union Treasurer Tommy Propst, "[b]y removing the engineer requirement, the negotiators for Local 2057 believed that it was making eligible hundreds of firefighters, including women and minorities, for the lieutenant's exam." Propst Declaration (attached to Doc. 59), ¶ 26, at 13. Then-County Chairman Mel Martinez has opined that elimination of the engineer requirement increased the number of minorities eligible to take the test because there were so few minority engineers in 1999. *See* Response of Non-Party Mel Martinez to Plaintiffs' Written Questions Under Federal Rule of Civil Procedure 31 (attached to Doc. 34), Response to ¶ 4, at 5.

In return for Local 2057's agreement to drop the engineer qualification, the County proposed a 5-year time-in- service requirement. Rhame Affidavit, ¶ 12, at 6. The Union countered with an 8-year time-in-grade proposal. Rhame "was concerned about putting relatively new firefighters out into the position of company commander."[19] *Id.* at 6-7. In his view,

> Orange County did not prepare firefighters for company commander or leadership positions the way some other departments did. What it did was the traditional approach, namely to let the individual firefighter obtain specific skills training and management skills on their own by

---

[19]Apparently, the terms "lieutenant" and "company commander" are interchangeable. *See* Rhame Affidavit, ¶ 1, at 1 ("Prior to that, I worked as a company commander, or lieutenant, from 1992 or 1993 until this last November.").

AO 72A
(Rev.8/82)

attending classes at Mid-Florida Tech or one of the community colleges or universities in the area. In contrast, there are some fire departments that operate officer training or leadership schools or on-the-job training programs pushing firefighters to pick up the skills needed to function in a company commander position. Those fire departments, as a result, can operate with a shortened experience requirement for promotion to the company commander position. Also, in other departments, such as Seminole County, where the rank of engineer is not formally utilized, the fire departments create special categories or classes of firefighters who effectively function as an engineer in Orange County. This allowed for a firefighter to move up and improve their technical and leadership skills. Locally, the City of Orlando experimented with dropping the engineer requirement and reportedly didn't like the results. As a result, the City of Orlando requires the engineer experience before becoming eligible for a company commander. While dropping the engineer requirement presented risks, in my opinion the 8 year requirement would help offset the lack of experience as an engineer. Dropping the engineer requirement and allowing firefighters with 8 years service seemed to me to be the sensible and safe thing to do.

Rhame Affidavit, ¶ 12, at 7.

Rhame also says he considered the impact of the 8-year rule on the firefighter ranks. In that regard, he states:

I also operated with information showing that the number of persons affected by the five year versus the eight year requirement was very small, especially when you took into account the number of employees with less than 8 years service who could not qualify because they did not meet the other educational and certification requirements, including the course worked [sic] needed to test for fire officer certification. I felt that the number of persons affected by the change from 8 to 5 was small, about forty firefighters. In contrast, about 400 firefighters were eligible as a result of the change allowing firefighters with 8 years service to be eligible. During negotiations, I was never informed as to the gender or racial breakdown of the persons directly affected by the 8 vs 5 year requirement. The local does not keep records showing the racial or gender breakdown of the work force and Orange County did not provide us with any information showing what effect [sic] the eligibility requirements would have on minority employees of the fire department. With the showing that 400 persons, out of total

-20-

department size of 700, were going to be eligible under the 8 requirement, I felt it was fair to everyone. I also assumed that most of the 40 employees who would be eligible under the 5 year rule, but not under the 8 year rule, would not meet the educational requirements. As it was, many of the firefighters with 8 or more years did not have the educational and certification required to operate as lieutenants. The educational requirements included course work, usually at a local college and on the firefighters own time, and testing with the State Fire College. These are the types of classes and certification firefighters do not normally pick up until they are employed some time with the department. It is especially true of the Fire Officer course and certification requirement. This assumption was later proven true when we discovered that a substantial number of the applicants for the lieutenant's exam, including some of the plaintiffs, had not completed their Fire Officer certification requirement despite having 8 plus years on the department. In fact, one of the persons who made the top 60 cut off could not be promoted because he did not have the fire officer certification.

*Id.* at 7-8.

Rhame's views are echoed by Union Treasurer Propst, who was a member of the Union's collective bargaining negotiation team:

[B]y deleting the requirement that a firefighter first obtain engineer rank before testing for lieutenant it radically changed the promotion system and opened the lieutenant exam to hundreds of persons who would otherwise be ineligible. We, by that I mean the union negotiating team, were of the opinion that the commission's action benefitted women and minority firefighters. It was a consensus among the local's negotiating committee, myself and 4 others, that the number of minorities affected adversely by the 8 year requirement was negligible. In contrast, the deletion of the engineer requirement opened up the testing process to literally hundreds of potential candidates, who would not otherwise have been eligible. From our perspective, the way to fairly open the combat promotion ranks was to eliminate the agreed upon bottleneck caused by the engineer requirement. In negotiations, we were led to believe that the best way to help minorities was to remove the engineer requirement. While some of the committee were concerned about the effects such a change would have on the fire service, Local 2057 decided to make the proposal on its own.

Propst Declaration, ¶ 26, at 13.

On March 30, 1999, the Orange County Commission considered the time-in-grade requirement. Fire Chief Iacona advocated the 5-year requirement; the Union opposed that recommendation and proposed the 8-year experience rule for firefighters. The Commission adopted the 8-year rule for firefighters; engineers with 6 years of service and 2 years in the rank of engineer were eligible to take the lieutenant's exam.

In their summary judgment response, Plaintiffs have not identified a shred of evidence which casts doubt on Rhame's and Propst's articulated motivations for advocating the 8-year requirement. Instead, Plaintiffs argue that because the Union knew that the 8-year rule would eliminate more minorities from lieutenant eligibility than a 5-year rule,[20] it was obligated to present a "study or any other proof" at the County Commission hearing that the 5-year rule would negatively impact public safety, and its failure to do so is evidence of pretext. This contention is erroneous. The question is not whether the Union was correct in opposing the 5-year rule on public safety grounds, it is whether

---

[20] At the March 30th County Commission hearing, the following exchange occurred:

| Chairman | Okay. Commissioner Freeman had a question. |
| Freeman | Yeah. Mr. Rhame, of the 400 applicants in the pool, how many were minorities, women, Hispanics, Blacks, Asians, whatever? |
| Rhame | I couldn't tell you, Commissioner. We don't keep those records. The fire chief would have to do that. |
| Freeman | Yeah. Chief, can you answer the question? |
| Iacona | Yes. Under the five years requirement, we would have a total of 89, or 22% of the applicant pool would be minorities or females. Under the rule of eight, there would be 61, or 16.1%. |

Exhibit "E" to Doc. 33 at 6. It is clear from this exchange that Rhame was informed at the hearing of the impact the 8-year rule would have on minorities (and women). However, Rhame's response to the commissioner is not inconsistent with his testimony that he did not have knowledge *at the time of negotiations* of "the gender or racial breakdown of the persons directly affected by the 8 vs 5 year requirement." Rhame Affidavit, ¶ 12, at 8.

-22-

the Union did so for reasons of racial animus. There is no evidence from which a reasonable jury could conclude that the Union was motivated by race, particularly given the Union's choice to support elimination of the engineer requirement and thereby "open up" the lieutenant's exam to more minorities. Accordingly, Local 2057 is entitled to summary judgment on this aspect of Plaintiffs' disparate treatment claim.

Similarly, Plaintiffs have not presented evidence from which a reasonable jury could find that the Union was motivated by racial animus when it allegedly failed or refused[21] to take the Plaintiffs' grievance concerning the lieutenant's test to arbitration.

In his affidavit, Rhame states that he learned in January 2000 that a hearing would be held concerning Plaintiffs' grievance over the lieutenant's test. Rhame Affidavit, ¶ 13, at 8-9. Non-union member Plaintiff Booker Perry, who was identified as the representative for all six grievants, told Rhame "that he did not want the local involved in the grievance." *Id.*, ¶ 13, at 9. Nevertheless, since some of the grievants were union members, Rhame sent them a letter offering union assistance with the grievance; he never received a reply requesting help. *Id.*

Rhame attended the proceedings at the 2nd and 3rd steps of the grievance process. *Id.*, ¶ 15, at 10. Rhame says that Plaintiffs raised the issue of race for the first time at step 3, the Grievance Adjustment Board hearing. *Id.*, ¶ 16, at 10. Previously, the Plaintiffs' articulated concerns had been about alleged cheating during the exam. *Id.*, ¶¶ 14 & 15, at 10. In fact, says Rhame, "Booker Perry stated at the 2nd step hearing that race was not an issue in the grievance." *Id.*, ¶ 16, at 10. Rhame listened to all of the witnesses who testified at the hearing, including Tom Rockhill, the County's testing consultant. *Id.* According to Rhame,

---

[21]There is conflicting evidence concerning whether the Plaintiffs actually asked the Union to seek arbitration.

AO 72A
(Rev.8/82)

> Mr. Rockhill seemed to defend his testing process very well and, from
> what I could tell, he rebutted the arguments about the test. I came
> away from that 3rd step grievance hearing concluding that the County
> had done the best it could to come up with a fair test.

*Id.,* ¶ 17, 10-11.

However, notwithstanding the fact that he sent Plaintiffs' former attorney, Gary Wilson, a
letter stating the Union would not pursue Plaintiffs' grievance to arbitration,[22] Rhame maintains that
the Union "never refused to take any of the plaintiffs' grievances to arbitration." Rhame Affidavit,
¶ 25, at 14. Rhame offers the following explanation:

> I was called by Gary Wilson, the attorney for the plaintiffs, in May of
> 2000 and he told me he needed a letter to settle or end the case for the
> plaintiffs. He said he was not going to take the case any further. He
> also told me that he was not going to continue representing the
> grievants because they could not afford to pay his firm. I agreed to
> send the letter he requested only because he asked for it. I put in the
> letter what he asked for. He did not ask me to take the plaintiff's
> grievance to arbitration. If he had I would have told him that Local
> 2057 could not represent Perry and the other non-member. I would
> have also told him that the request would have to come from a member
> and not an attorney. At the time, I personally did not think that the
> plaintiffs had a grievance that would succeed at arbitration and, if it
> came to a vote I probably would have objected to any motion to submit
> their grievance to arbitration. It was my opinion that the grievance did
> not have much chance of success at the final, arbitration step.
>
> * * *
>
> I did not explain my opinions to Mr. Wilson and he did not ask me for
> it [sic]. The letter I sent to him was exactly what he asked for. I also

_____

[22]Rhame's April 7, 2000 letter states, in pertinent part:

> Please accept this correspondence, as previously stated in our phone conversation on
> April 6, 2000, that the Orange County Professional Firefighters Local 2057 will not
> pursue grievance #0389 to arbitration. Furthermore, we are not in support of the
> individuals involved proceeding to arbitration.

Exhibit "G" to Doc. 73.

AO 72A
(Rev.8/82)

did not contact anyone else in the local or talk with the local's attorneys before sending the letter. If I knew then what I know now, I would not have sent the letter without first talking to someone. At the time, based on what Mr. Wilson said, I though[t] he did not want to go to arbitration and wanted me to give him a letter to bring the grievance to an end. It was not my intention to bind the local or the membership by the letter I wrote to Mr. Wilson.

Local 2057 never refused to take any of the plaintiff's grievances to arbitration. The decision to take a case to arbitration ultimately lies with the membership. Regardless of my opinion, any of the other executive board officers or any member can make a motion to take a case for arbitration. I was not asked to take the plaintiff's grievance to arbitration or asked to make a motion. At any time, the plaintiffs who were members of Local 2057 could have come to a meeting of the local and made a motion or asked another member to make the motion. This was never done and, as a result, no action was taken either way by the local on the grievances.

Rhame Affidavit, ¶¶ 22, 24 & 25, at 12-14.

Rhame also explains why he believed the grievance was unlikely to succeed at arbitration:

The grievance itself was untimely and the contract had very strong language requiring a grievance to be filed within 10 days of the [sic] when the grievants discovered the contract violation. Perry and the other grievants, like everyone else who took the test, knew about the qualifications and the procedures months before they [sic] exam itself. The Fire Department published notices of the test, listing the requirements and required all candidates to sign and have the qualifications cleared before the October testing. In addition, orientation classes were held in the summer of 1999 explaining the test, even showing the examples of the questions and how some of the exercises would look. The materials that the test questions and answers were drawn from were also identified. In the case of the grievants, and the remaining candidates who did not make the top 60, they knew they didn't make the list before the 4th final part of the test was administered, probably in late October or early November. The grievance itself was not filed until late December, over a month after the grievance [sic] knew of everything they complained of and over a month after they knew they did not make the score needed to get on the new lieutenant's promotion list. In addition, the grievance itself was changed from the 2nd step to the 3rd step. What the grievance said and

-25-

what was presented at the 3rd step was different. In my opinion, an arbitrator looks at what the grievance says in deciding what the issues are in the arbitration. Finally, I did not think the grievance had any chance of success because after listening to the grievant's position at the 2nd and 3rd steps in the process[,] I was of the opinion they simply didn't have the evidence to show a contract violation. The contract didn't give us much say in the promotion testing process itself. I was repeatedly reminded during my the [sic] time I served as a union officer that the grievance procedure is for us to challenge violations of the contract or disputes as how the contract language is to be applied.

It is not a general appeal procedure allowing us to challenge management['] s conduct. Many of the things that were listed on the grievance filed by the plaintiffs were things that management controlled and the union had no way of grieving. Of course, even if we could, the grievants did not show there was evidence to support the charges, especially the charges of cheating or a breach in test security, something I though [sic] we could grieve if there was evidence. The grievance, at least as I read it, dealt with the [sic] whether the tests actually measured the work preformed [sic] at the department, whether there was a breach in test security, and the fact that the experts used different scores over the two days of testing. After participating in the two hearings on the grievance, steps 2 and 3, I did not believe that the union contract allowed us to grieve most of the issues raised and, even if we could, there was not enough evidence to support the complaints.

Rhame Affidavit, ¶ 23, at 12-13.

In their summary judgment response, Plaintiffs fail to identify any evidence controverting Rhame's testimony that (1) he believed Plaintiffs' grievance against the County had little, if any, merit and (2) Plaintiffs' and their attorney never actually asked the Union to take the grievance to arbitration. Significantly, Plaintiffs have not filed an affidavit of their former counsel, Gary Wilson, challenging Rhame's account of the telephone conversation that prompted Rhame's April 7th letter. However, even assuming Plaintiffs requested arbitration and the Union refused, Plaintiffs' summary judgment response points to no evidence disputing Rhame's belief that he thought the grievance unlikely to succeed in arbitration. Additionally, Local 2057 has presented evidence that it has not

taken a promotion dispute to arbitration in the last 20 years. *See* Rhame Affidavit, ¶ 21, at 11; Propst Declaration, ¶ 30, at 16. During this period, the Union has consistently refused to challenge promotion or testing disputes, including those involving white firefighters claiming "reverse discrimination." Propst Declaration, ¶ 30, at 16. On the other hand, Local 2057 has taken the termination claim of at least one African-American firefighter to arbitration, resulting in reinstatement. *See* Declaration of Marcus A. Crowden (attached to Doc. 59), ¶ 9-11, at 1-2. Under these circumstances, no reasonable jury could find that the Union was motivated by discriminatory intent concerning the arbitration issue.

### D. Disparate Impact

Local 2057 is entitled to summary judgment on Plaintiffs' disparate impact claim for the same reasons the Court is granting Orange County's motion for summary judgment directed at this claim. *See* § IV.C., *supra.*

### E. Retaliation

Plaintiffs also claim the Union refused Booker Perry union membership in retaliation for Perry's filing of an EEOC charge against the County concerning the lieutenant's exam.

On this point, Rhame's affidavit states:

> For as long as I have been a member of Local 2057, the membership has had a policy of not accepting membership applications from bargaining unit employees who are having job related problems with Orange County. In all these years, each and every time a bargaining unit employee applied for membership with the local and there was information that the applicant had either real or potential problems, including discipline or a grievance with Orange County, we tabled the application or, in some instances, the membership voted no on the application for membership. The policy is intended to prevent people from joining just to obtain representation. Booker Perry did apply for membership in early 2000. His membership application was tabled,

-27-

after a recommendation by the secretary/treasurer. No one moved his application to a vote so the application was tabled, by vote of the membership. Sometime later, I moved Perry's membership for a vote and recommended he be admitted. It was after grievances had been cleared up. Before I made the motion, no one, and that includes [co-Plaintiff] James Jackson, ever moved Perry's membership application for a vote. The decision to table Perry's membership application had nothing to do with him filing any charge of discrimination or complaining of discrimination. At the time the application was tabled, I was unaware of any charge or complaint of race discrimination by Perry. The grievance did not accuse anyone or [sic] discrimination. It was later, after the membership application was tabled that I first learned that he was raising the issue of race discrimination.

Rhame Affidavit, ¶ 26, at 14-15.

Then Secretary-Treasurer Propst supports Rhame's version of events. In his declaration, Propst confirms that the Union had a long-standing policy of tabling applications of persons seeking "to join out of fear of potential discipline or to seek assistance in a grievance." Propst Declaration, ¶ 8, at 4; *see also* ¶ 9 at 5 & ¶ 18 at 8-9. Propst recommended that Perry's application be tabled in February 2000 based on the existence of his grievance against the County and because Perry had dropped his membership in the past. *Id.*, ¶ 8, at 4. Upon motion by another member, the membership voted to table the application. *Id.* Propst maintains that the decision to table Perry's application had nothing to do with race. *Id.* In that regard, Propst states:

I have made a similar recommendation in each and every instances [sic] in cases like Perry's. White firefighter applications who [sic] were treated in the same manner include, Dale Lechman, Glenn Tegg, Tom Nile, and William Hoke. All four were former members and, like Perry, tried to get back in when we had reason to believe they were facing a dispute with Orange County Fire/Rescue. I also made an identical recommendation in the application of Betsy Hudson, a black female who applied for the first time, but did so after being employed for a period of time and who was expecting disciplinary action. When the discipline issue was cleared up[,] Ms. Hudson was voted in for membership.

-28-

*Id.*

Propst also confirms that the Union was unaware at the time it initially tabled Perry's application that Perry was claiming race discrimination in connection with the lieutenant's exam. In that regard, Propst states:

> At the time I made the recommendation to table Perry's membership application I was unaware of any charge of discrimination and unaware that there was any allegation of race discrimination in the lieutenant's test. What I had been told was that Perry and a number of the candidates for the lieutenant's exam held in October of 1999, were alleging that some of the successful candidates cheated on the exam. In addition, there was objections [sic] to the accuracy of some of the answers used to grade the test. At the time, I understood the persons who were challenging the test included white, as well as Afro-American and Hispanic firefighters. As an example, Tom Sawyer, a white firefighter and member of the local, was one of the persons challenging the 1999 lieutenant's exam.

*Id.,* ¶ 13, at 6-7.

Propst says he did not attend the 2nd step proceeding concerning Perry's grievance. *Id.* at 7. He says it was not until March or April of 2000 that he learned Perry and other minority firefighters were claiming race discrimination in connection with test design. *Id.,* ¶ 14, at 7. Propst states he was informed the issue of race discrimination "first came up at the Grievance Adjustment Board." *Id.* Moreover, Propst states it was not until September 2000 that he learned James Jackson had filed an EEOC charge against the Union. *Id.,* ¶ 14, at 7. Shortly thereafter, Propst says, he learned that an EEOC charge had been filed against Orange County. *Id.*

In their summary judgment response, Plaintiffs state that the Union "knew that Plaintiff PERRY had filed an EEOC charge against the COUNTY on March 3, 2000 and it was only after that filing of the EEOC charge that the UNION made its decision not to admit PERRY. (See Plaintiff's

AO 72A
(Rev.8/82)

[sic] Ex. H, minutes of the March 14, 2000 and April 11, 2000 UNION meetings, *which stated that because PERRY had an outstanding grievance and EEOC claim against the COUNTY, he would not be admitted to the UNION at that time*." Doc. 73 at 18 (emphasis supplied). However, these union meeting minutes do not say this; rather, they state that Perry's application was being tabled pursuant to the Union's policy concerning applicants involved in grievances, legal matters, or discipline. There is no mention whatsoever of Perry having filed an EEOC complaint. Hence, Plaintiffs have presented no evidence that at the time the Union voted again in March and April 2000 to table Perry's application, the members were aware that Perry had filed an EEOC charge against the County.[23]

In the Court's view, the issue presented is whether the Union can be held liable for initially tabling Perry's application in February 2000 pursuant to an established race-neutral policy of not admitting applicants with pending disputes against the County, under circumstances in which the Union was unaware Perry had filed an EEOC charge and was not even aware that Perry's grievance complained of race discrimination. The Court does not believe the concept of retaliation can be stretched this far. An additional issue is whether the Union violated Title VII's anti-retaliation provision by tabling Perry's application again in March and April 2000, after Perry had filed his EEOC charge against the County and at a time when Union President Rhame and Vice President Saunders (who both had attended the stage 3 grievance proceeding) knew that Perry was claiming race discrimination in connection with the lieutenant's test. Again, in the Court's view, the concept of

---

[23]Perry's affidavit states that the Grievance Adjustment Board hearing was on March 6, 2000, that evidence concerning the test's impact on minorities was presented at the hearing, and that Union Vice President Robert Saunders was one of the board members. *See* Doc. 78, ¶ 2, at 1-2. The most that can be made of this evidence is that a union official was aware at the time of the March and April union meetings that Perry's grievance alleged discrimination based on race. This is also the situation with former Union President Rhame, who also attended the Grievance Adjustment Board hearing. However, this does not constitute evidence that the Union was aware at the March and April meetings that Perry had filed an EEOC charge.

-30-

retaliation cannot sweep this broadly. Even if the Union knew by then that Perry had filed an EEOC charge against the County, the fact remains that Perry has not presented any proof controverting the Union's evidence that it *always* tabled membership requests from applicants of all races who were facing, or involved in, disputes with the County. Under these circumstances, no reasonable jury could conclude that the Union retaliated against Perry, through application of its pre-existing and race-neutral policy, for the specific act of filing an EEOC charge.

Plaintiffs argue the Union is nevertheless liable for retaliation because the Union did not admit Perry until long after Perry's grievance was resolved. In that regard, Perry points out that although his grievance with the County was dismissed on March 28, 2000, he was not admitted into the Union until August 19, 2001. Perry Affidavit (Doc. 78), ¶ 1, at 1.[24] This, too, fails to present a triable issue concerning retaliation. The same justification for initially tabling Perry's application - his dispute with Orange County concerning the lieutenant's test - continued to exist through the time Perry was admitted into the Union, and beyond. Although Perry's grievance was denied in late March 2000, his overall dispute with the County remained, culminating in his filing of the present lawsuit against the County and the Union. Indeed, Perry's dispute with the County exists to this day, in the form of this court case. Given these circumstances, it is surprising that the Union decided to admit Perry at all. Again, the bottom line is that Perry has not presented any evidence from which a reasonable jury could conclude that the Union delayed his admission in retaliation for the specific act of filing an EEOC charge; the evidence of record demonstrates that the delay was attributable to a pre-existing, race-

---

[24]The Parties have agreed in their final pretrial statement that the Grievance Adjustment Board denied Perry's grievance on March 28, 2000; that Perry filed his EEOC charge against the County, claiming race discrimination in connection with the lieutenant's exam, on March 3, 2000; and that Perry was admitted to the Union on August 19, 2001. *See* Doc. 101, § IX.A., ¶¶ 1, 19 & 20, at 24-26.

neutral union policy generally applicable to employees with disputes against the County. The fact that the Union retreated from that policy and decided to admit Perry before this lawsuit was resolved does not convert its prior, justified, position into an act of retaliation. Accordingly, the Union is entitled to summary judgment on Plaintiffs' retaliation claims.[25]

## V. CONCLUSION

The Plaintiffs have failed to present evidence sufficient to create a triable issue concerning intentional race-based discrimination, disparate treatment, disparate impact, or retaliation. Accordingly, it is ORDERED as follows:

1. Defendant Orange County's Motion for Summary Judgment On Counts I, II, and III of the Plaintiffs' Complaint (Doc. 32), filed May 2, 2002, is GRANTED IN PART AND MOOT IN PART.

The Motion is GRANTED insofar as it seeks summary judgment on Plaintiffs' disparate impact claim alleged in Count III of the Complaint.

Insofar as it seeks summary judgment on Counts I and II of the Complaint, the Motion is MOOT. Those counts were previously dismissed.

2. Defendant Local 2057's Amended Motion for Summary Judgment (Doc. 62), filed May 13, 2002, is GRANTED.

3. Defendant Local 2057's Motion for Summary Judgment (Doc. 57), filed May 9, 2002, is MOOT.

---

[25]Plaintiffs also claim that the Union's failure to pursue their grievance to arbitration, or to permit the Plaintiffs to arbitrate, constitutes retaliation. Extended discussion of this claim is necessary. It suffices to say that Plaintiffs have presented no evidence from which a reasonable jury could find that the Union's decision in this regard was in retaliation for the filing of an EEOC charge.

AO 72A
(Rev.8/82)

4. Plaintiffs' and Defendant Orange County's Joint Stipulation Dismissing Plaintiff James Jackson's Claims With Prejudice (Doc. 82), filed June 28, 2002, is APPROVED. James Jackson's claims against Orange County are DISMISSED, WITH PREJUDICE. Jackson and the County shall bear their own costs and attorneys' fees as to these claims.

5. Defendant Local 2057's Motion to Dismiss Count I of Complaint for Lack of Jurisdiction (Doc. 105), filed August 12, 2002, is DENIED.

6. The following motions are MOOT:

   a. Defendant Orange County's Motion to Bifurcate Trials of Disparate Impact and Disparate Treatment Claims (Doc. 88), filed July 26, 2002;

   b. Plaintiffs' Motion In Limine Requesting This Court Take Judicial Notice of the United States Census Bureau's 2000 Census for Orange County, Florida (Doc. 93), filed July 26, 2002;

   C. Defendant Orange County's Motion to Strike Plaintiffs' Claims and to Exclude Evidence Regarding Eight-Year Time-In-Grade Requirement (Doc. 96), filed July 26, 2002.

7. The Clerk is directed to enter a final judgment providing as follows:

   Plaintiff James Jackson's claims against Defendant Orange County, Florida, are dismissed, with prejudice, pursuant to stipulation. Jackson and the County shall bear their own costs and attorneys' fees as to this claim.

   Plaintiffs Booker Perry, Stacy McLean, Terry Hawkins, Robson Suarez, and Juan Baquero shall take nothing on their claims against Defendant Orange County, Florida. Orange County shall recover its cost of action on these claims.

   Plaintiffs Booker Perry, James Jackson, Stacy McLean, Terry Hawkins, Robson Suarez, and Juan Baquero shall take nothing on their claims against Defendant Orange County Professional Firefighters, Local 2057, International Association of Firefighters. Local 2057 shall recover its costs of action on these claims.

-33-

8. The Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida this _____ day of September, 2002.

ANNE C. CONWAY
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

AO 72A
(Rev.8/82)

Date Printed: 09/04/2002

Notice sent to:

___  Thomas J. Pilacek, Esq.
     Thomas J. Pilacek & Associates
     Red Willow Plaza
     5844 Red Bug Lake Rd.
     Winter Springs, FL  32708

___  Kevin W. Shaughnessy, Esq.
     Akerman, Senterfitt & Eidson, P.A.
     255 S. Orange Ave.
     P.O. Box 231
     Orlando, FL  32802-0231

___  Deborah A. Gibson, Esq.
     Akerman, Senterfitt & Eidson, P.A.
     255 S. Orange Ave.
     P.O. Box 231
     Orlando, FL  32802-0231

___  Joseph Egan Jr., Esq.
     Egan, Lev & Siwica, P.A.
     231 East Colonial Dr.
     P.O. Box 2231
     Orlando, FL  32802-2221

___  Kathryn Sydny Piscitelli, Esq.
     Egan, Lev & Siwica, P.A.
     231 East Colonial Dr.
     P.O. Box 2231
     Orlando, FL  32802-2221