## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**BOOKER PERRY, JAMES JACKSON,**
**STACY McLEAN, TERRY HAWKINS,**
**ROBSON SUAREZ and JUAN BAQUERO,**

          **Plaintiffs,**

                            **Case No. 6:01-cv-208-Orl-22KRS**

**ORANGE COUNTY and ORANGE**
**COUNTY PROFESSIONAL FIREFIGHTERS**
**LOCAL 2057, INTERNATIONAL ASSOCIATION**
**OF FIRE FIGHTERS,**

          **Defendants.**

_____/

### DECLARATION OF GARY D. WILSON[1]

I, GARY D. WILSON, hereby state and declare, under penalty of perjury, that the following information is true and accurate to the best of my knowledge and information:

1.      I make this Declaration in response to the Order To Show Cause issued by this Court on June 25, 2004, based upon my own knowledge and information, as set forth hereinafter.

## I.  GENERAL BACKGROUND

2.      By way of background, I am an attorney licensed to practice law in the State of

---

[1]I was employed with Thomas J. Pilacek & Associates from November, 1993 until May 3, 2002. Therefore, I am unable to respond to the Court's instant Order To Show Cause (Doc. 202) that relates to directives for decisions that were rendered solely by Mr. Pilacek following my departure. Specifically, I had no role in the decision to drop the intentional discrimination and disparate treatment claims against defendant, Orange COUNTY, Florida (Counts I and II); or any decisions made after May 3, 2002, such as whether to proceed from that date forward with claims against the Defendant UNION, or for continuing to pursue the disparate impact claims after the close of discovery; with all such decisions occurring after my departure from Mr. Pilacek's firm.

EXHIBIT "B"

Florida, and have continuously practiced law in this state from 1990 to the present. After serving as a State (Circuit) Court law clerk for a little over one (1) year, and then as General Counsel for a company for nearly three (3) years, I met Thomas J. Pilacek, Esq. ("Mr. Pilacek") through our company's engagement of his services to handle an employment discrimination claim.

3.      I thereafter became employed with Mr. Pilacek's firm, Thomas J. Pilacek & Associates, in or about November, 1993 and remained employed there for the next approximate eight and one-half (8 1/2) years. While working for Mr. Pilacek as an associate attorney, I focused my primary practice representing plaintiffs in civil rights litigation, as well as police and correctional officers in administrative matters. Immediately prior to joining my present law firm, Jill S. Schwartz & Associates, I also practiced for a little over one and one-half (1-1/2) years with Akerman Senterfitt, P.A. ("Akerman"), from May 8, 2002 through December 31, 2003. While at Akerman, I represented employers and management exclusively. I returned to practicing primarily on behalf of individuals and plaintiffs in January of this year (2004).

4.      I am a member of the American Bar Association, the Federal Bar Association (where I currently serve as Treasurer), the Florida Bar Association and the Orange COUNTY Bar Association ("OCBA"). I served as Chairman of the Labor and Employment Law section of the OCBA for the year 2002-2003. I am admitted to practice before the U.S. Court of Appeals for the Eleventh Circuit, as well as the United States District Courts for the Northern and Middle Districts of Florida.

5.      I accepted an offer of employment with Mr. Pilacek in 1993 because, in addition to my desire to commence private practice, I wanted to associate myself with and learn from a highly-skilled practitioner. I had a desire to learn labor and employment law and I knew of Mr. Pilacek's

outstanding reputation for honesty and integrity in the pursuit of claims on behalf of individuals and UNIONs.  My respect for Mr. Pilacek's skills and abilities only increased over my tenure with him. In fact, as a single illustration of such, we would typically consult many times the numbers of potential clients, as compared to claims that we would actually accept.  We would routinely decline representation of various claims of arguable merit, and repeatedly determined to not pursue or drop claims which we believed were without sufficient basis in law or fact, or which developed after representation.  In short, during all of my years of working with Mr. Pilacek, I never knew Mr. Pilacek or our firm to engage in any subjective or objective bad faith in the pursuit of any claims on behalf of our clients, nor do I believe that Mr. Pilacek or I did so in the instant lawsuit.  During my years of practicing with Mr. Pilacek, I also never had a motion for sanctions of any kind filed against me or, to my knowledge, Mr. Pilacek, until this case.

6.      As another preliminary matter, I eventually developed my own full case load over the course of my tenure with Mr. Pilacek's firm.  It should be noted, however, that neither I, nor Mr. Pilacek to my knowledge, had ever before prosecuted a disparate impact case. Nonetheless, and in keeping with the general procedure of our two person firm (Mr. Pilacek and myself being the only attorneys), I would apprise Mr. Pilacek as to developments in my cases, discuss legal theories, prosecution strategies, etc.

7.      It should be further noted that, although I did handle the day-to-day prosecution of this case (which was filed on February 15, 2001), I had no role in the case whatsoever after May 3, 2002, including any of the decisions made to drop Counts I and II against the COUNTY based upon intentional race discrimination and disparate treatment, with both apparently occurring as a result of a joint agreement entered into on or about May 28, 2002, approximately three (3) weeks after my

-3-

final day working with Mr. Pilacek (see n.1, supra).

## II.  BACKGROUND TO THIS CASE

8.       Specifically, in regards to the instant case, as an associate for Mr. Pilacek, I met with the Plaintiffs/Clients and Mr. Pilacek initially to review their allegations and concerns.  From a review of my notes, it appears that our initial meeting with Mr. Pilacek and all or most of the Plaintiffs and myself occurred on January 22, 2000.  In that meeting, it was determined that, prior to initiating a lawsuit based a theory of disparate impact in regards to the 1999 promotional process within Defendant Orange County, Florida's ("COUNTY) Fire and Rescue Division, an outside expert would need to be retained to assess the examination process from the perspective of the test's content validity, reliability and disparate impact, if any.

9.       The Plaintiffs and, to the best of my recollection, Booker Perry in particular, had already engaged in some research and networking through other sources, and had recommended that Paul Hoffman, Ph.D. ("Dr. Hoffman") be seriously considered.  I was then tasked by Mr. Pilacek to learn more about Dr. Hoffman's background and to research his credentials, training and experience in cases involving promotional examinations.

10.       After receiving and reviewing Dr. Hoffman's curriculum vitae ("CV"), background and experience, including experience in designing tests for municipalities and critiquing such examinations, the decision was made to retain Dr. Hoffman.  As a result, but _prior_ to making a determination as to whether or not to file suit on behalf of the Plaintiffs, Dr. Hoffman was retained on or about February 7, 2000 by virtue of a letter from Mr. Pilacek, together with a retainer fee that was paid by the Plaintiffs to our firm.  Thereafter, on or about February 18, 2000,  I forwarded documents to Dr. Hoffman at his request and engaged in several conversations with him between

mid-February and early March, 2000; prior to being retained and engaged by the Plaintiffs to pursue their grievance to step 3 before the Grievance Adjustment Board ("GAB").

11.     Dr. Hoffman eventually tendered a report outlining his opinions, based upon his vast training, education and experience (which included a Doctorate degree from Stanford University, with a minor in Statistics), with his initial report being received on March 5, 2000, and attached as Exhibit 2 to his deposition in this litigation.  Following the GAB hearing on March 6, 2000, the GAB allowed experts retained by both the grievants and the COUNTY, Dr. Hoffman and Burroughs & Rockhill, Inc. ("BRI"), respectively, to each offer rebuttal reports, prior to the GAB issuing its ruling.  Dr. Hoffman accordingly prepared a rebuttal to BRI's response to his initial report, which was attached as Exhibit 1 to Dr. Hoffman's deposition.  Despite his well-reasoned report and rebuttal (which included the proffer of reasonable alternatives, which were largely not addressed by BRI), the GAB predictably voted to deny the grievance on or about March 23, 2000.  The GAB was comprised of Chief T. J. Lyon, a management representative within the COUNTY's Fire and Rescue Division, Barry Saunders, the UNION'S Vice President and  COUNTY employee, Ceretha Leon.

12.     I was thereafter tasked with filing a Charge of Discrimination on behalf of Booker Perry and the other Plaintiffs, as well as all other similarly situated African-Americans and Hispanics.  The charge was filed with the EEOC on or about March 3, 2000, just prior to the GAB hearing.

13.     From a review of my notes, Mr. Pilacek and myself met with the Plaintiffs on August 8, 2000 to discuss the three (3) primary options with our clients; namely, to wait for the investigation to continue by the EEOC, to request right to sue authorization, or to withdraw the charge.  I thereafter continued to meet with the clients periodically and, on occasion, with Dr. Hoffman.  I also

continued to keep Mr. Pilacek informed of the status of the proceeding.

14.     Ultimately, the clients retained our services to take the next step forward, which included filing the instant federal lawsuit on February 15, 2001.  I was tasked with the responsibility of drafting a <u>Verified</u> Complaint, which Mr. Pilacek reviewed, corrected and/or revised where necessary.   The drafting of the Verified Complaint occurred with direct input from, and based on representations by, the Plaintiffs.   In fact, the reason that Mr. Pilacek and I insisted that our Plaintiff/Clients execute a sworn complaint was based on the fact that our clients had made very specific allegations, for which they contended there would be factual support.  Because there was no way to confirm some of the representations made by our clients until discovery occurred (which, as this Court is aware, is not permitted under Local Rule 3.05(c)(2)(B) until <u>after</u> the Case Management Meeting), the decision was made by Mr. Pilacek and I to have our clients execute a sworn complaint.  In addition, the reason that Mr. Pilacek and I determined to draft a specific, rather than a "bare bones" complaint, was based upon case law that requires that factual allegations be fairly specific.  <u>See</u>, <u>e.g.</u>, <u>Jewel v City of Covington</u>, 425 F. 459, 460 (5th Cir. 1970) (holding that "[g]eneral conclusory allegations unsupported by facts are insufficient to constitute a cause of action")[2].

15.     Further, because I had never prosecuted a disparate impact case before, and also based upon our clients' insistence that Mr. Pilacek be involved with every significant step of the process, I consulted with and kept Mr. Pilacek apprised throughout the prosecution of the case.  Accordingly, and in contrast to, and with all due respect, Magistrate Glazebrook  is in error, at least in part, regarding his representation at page 28 of his Report and Recommendation (see Doc. 190, p.28.)  While it is true that I made "most of the decisions in this case," Mr. Pilacek and I conferred

---

[2]  <u>See</u> <u>Bonner v City of Prichard</u>, 661 F. 2d 1206, 1209 (11th Cir. 1981) )(en banc)(adopting as binding precedent in this circuit all decisions of the former Fifth Circuit rendered prior to October 1, 1981).

on all major decisions.  Moreover, Mr. Pilacek did <u>not</u> fail to "closely investigate[] the basis of plaintiffs' claims during [my] tenure."  To the contrary, I believe that Mr. Pilacek and myself thoroughly evaluated our clients' claims, to the extent that we were able due to the constraints of the Local Rules prohibiting discovery prior to the Case Management Meeting; as well as within the limitations imposed by the short window within which a plaintiff is required to determine whether or not to file suit (i.e., 90 days after receiving the right to sue authorization.)  Based on such, I also hereby concur with, assert, and adopt the arguments set forth under the "Rule 11 Standards" portion of our Joint Response which is filed concurrently with, and as part of, my Declaration.

### III.  <u>FACTS CONSIDERED FOR LEGAL CLAIMS PURSUED</u>

16.     I, and to the best of my knowledge and opinion, Mr. Pilacek, believed in good faith that we could take the positions that were taken in this matter, based upon the following reasons: (a) the representations made by our clients, as corroborated by the fact that they were willing to execute a sworn complaint swearing to the factual assertions set forth in the Verified Complaint; (b) the opinions rendered in the initial and rebuttal reports of Dr. Hoffman who, based upon his outstanding credentials, appeared to be an expert worthy of credibility; and (c) based upon actions and behavior engaged in by Defendants, COUNTY and Professional Firefighters, Local 2057 (International Association of Firefighters ("LOCAL 2057" or the "UNION").

17.     As to the specific allegations and with the foregoing background, I will now attempt to respond to the specific points embodied within this Court's Order To Show Cause, as follows:

(a)        **"alleging and persisting in the frivolous claim that the UNION refused to hire, promote and train minority applicants; that the UNION knew that the test information was being leaked to white applicants; and that the UNION played a significant role in the creation or administration of the examination."**

18.     Information concerning the above allegations came directly from the Plaintiffs.

Moreover, and without restating the same arguments, I hereby concur with, adopt and assert, as if set forth herein, the factual and legal arguments and rationale set forth by Mr. Pilacek in his Declaration in response to this specific issue of his Declaration.

19.     In fact, as Mr. Pilacek notes in his own Declaration  (for which I concur), while Mr. Pilacek and I knew that the allegations may be difficult to prove, our clients/Plaintiffs were adamant regarding the veracity of these allegations.  Once again, this is the very reason why we both insisted that the allegations be stated "on information and belief" in the form of a Verified Complaint.

20.     The assertion that the UNION had refused to hire, promote and train minority applicants was based upon the factors and analysis that Mr. Pilacek has set forth in his Declaration, which without restating, I adopt herein by reference.  In short,  this claim was based on several alleged facts as relayed by the Plaintiffs to Mr. Pilacek and myself, including the most salient; namely, that only four of approximately 120 Lieutenants were minorities, and that the UNION and the COUNTY had  acted in concert with each other in permitting so-called "ride-alongs" or "riding up" (i.e., opportunities for employees to gain supervisory experience by performing in a higher position such as engineer) for white firefighters, while denying such opportunities to African-Americans and Hispanics.  This allegation was never "persisted in" because, near the discovery deadline of April 5, 2002 and just prior to my departure from Mr. Pilacek's office, the COUNTY had still not furnished the "station logs" necessary to determine the identity of specific individuals and instances, although a request had been made by myself through counsel for the COUNTY. Following a discussion with Mr. Pilacek, we decided to not further pursue that allegation, and refrained from filing a Motion to Compel.  I was no longer employed with Mr. Pilacek to see how or if the issue was addressed at summary judgment.

-8-

21.  With regard to the allegation that the UNION knew test information was being leaked to white applicants, this was once again based on information from the Plaintiffs on "information and belief," and verified by Plaintiffs.  I recall that the Plaintiffs held a firm belief that cheating had occurred, which was conveyed to Mr. Pilacek and myself at one of the earliest, if not the initial meeting.  I specifically recall a discussion which was held with Plaintiff Perry and Mr. Pilacek regarding this allegation, and Mr. Pilacek and I inquiring as to whether it could be proved.  I also remember Plaintiff Perry (and perhaps one or two other Plaintiffs) advising of their hope and belief that the pursuit of this allegation might prompt individuals with actual knowledge to come forward with testimony.  Once again, this allegation was not borne out through discovery and, it is my understanding, was not pursued to summary judgment following my departure as the result of decisions by Mr. Pilacek.

22.  Finally, the information that the UNION played a significant role in the creation or administration of the examination was again based upon information provided by the Plaintiffs and, it is my understanding, was not pursued to summary judgment as the result of my decision. In addition, I was also aware, which apparently Mr. Pilacek has indicated he was not, of a letter dated January 27, 2000 from LOCAL 2057's President, Mark Rhame ("Mr. Rhame"), wherein he expressly informs all UNION members, including four of our specifically named clients, that **"...the UNION has been involved in the promotional process throughout the negotiation process up to and including the testing procedure itself."**   A copy of the letter from Mr. Rhame is attached to my Declaration as Exhibit "B-1."  When Mr. Rhame's letter was construed with the other facts that our clients conveyed to us during our initial meetings, it appeared that UNION had played an active and intentional role in creating a test with discriminatory impact, as well as being engaged in

a process to thwart training and other opportunities for minority firefighters.  Finally, although I had departed from Mr. Pilacek's firm, it is my understanding that the assertion of a refusal to hire, promote and train minority applicants, and the alleged leaking of test information to white applicants, (See Mr. Pilacek's Declaration) were issues that were abandoned by Mr. Pilacek prior to summary judgment.  Accordingly, it is my understanding from a review of the pleadings in preparing my response to your Honor's instant Order that the only issue in this regard that remained for purposes of summary judgment determination was the UNION's role in the creation or administration of the examination.  This is a fact that we still strongly believe in by virtue of the undeniable fact that several UNION members and officers (including Mr. Rhame) participated as Subject Matter Experts ("SME's").  This was key in my estimation, and I believe Mr. Pilacek's as well, as the role of the SME's was to help create and provide input on the test questions and fact scenarios, through the COUNTY's hired test designer - BRI.  Therefore, it was clear, and remains so even to the present, that the UNION did play "a significant role" in the creation of the 1999 Lieutenant promotional examination.

**(b)       "alleging and persisting in the frivolous claim that the UNION racially discriminated against minority firefighters by advocating an eight-year TIG rule and by failing to advance plaintiffs' grievance to arbitration."**

23.    Information concerning the above allegations came directly from the Plaintiffs.  Moreover, and without restating the same arguments, I hereby adopt and assert as if set forth herein, the factual and legal arguments and rationale set forth by Mr. Pilacek in his Declaration in response to this specific issue.

24.     Essentially, this allegation was based on the fact that Mr. Rhame adamantly put forth LOCAL 2057's position of advocating for an eight (8) year time-in-grade (TIG), despite failing to proffer any documents, data, or support for its exclusive argument that the eight (8) year TIG rule was appropriate due to "public safety." In the face of the COUNTY's and former COUNTY Chairman Mel Martinez's advocating of a five (5) year rule, the UNION's motivations appeared to be based upon a desire to maintain the "status quo" of having essentially only white firefighters at the rank of Lieutenant or above. This was further borne out by the fact that, following the promotional process, the number of minorities at the rank of Lieutenant or above remained at four (4) and, with the promotion of nearly sixty (60) white firefighters, represented an actual *reduction* in the *overall percentage* of minorities at the rank of Lieutenant. In short, the UNION's position on the eight-year TIG rule appeared to be nothing more than arbitrary, discriminatory, and based upon an underlying purpose to assist the overwhelming majority of its dues-paying members, who were white firefighters.

25.     In regards to alleging and persisting in the claim that the UNION failed to advance the Plaintiffs' grievance to arbitration, it is our position that this is a matter of factual record and can hardly be disputed. First, one of the primary reasons that our firm was retained to pursue the matter to step 3 was based upon a comment made by Mr. Rhame to one of our clients, Plaintiff Juan Baquero, at step 2 of the grievance process, wherein Mr. Rhame stated that the grievance would not advanced any further by the UNION. From a review of my handwritten notes, this remark was relayed to me by Plaintiff Baquero during a meeting at our law office on March 21, 2001, and perhaps even earlier. At that point, the Verified Complaint had been filed for merely five (5) weeks, but it gave further corroboration as to why Mr. Pilacek and myself persisted upon this claim.

26.   It should also be noted that, at the step 2 proceeding, the overwhelming bias against the grievants was evident in the fact that <u>Mr. Rhame</u> answered questions directed to the Former Chief Michael Iacona ("Chief Iacona").  According to one of our clients (and, based on a review of my notes) Plaintiff Stacy McLean, contended that Mr. Rhame answered several questions directed to Chief Iacona at the step 2 grievance hearing.  In addition, I was informed by our clients (and I believe by Plaintiff McLean, in particular) that approximately three (3) to five (5) white firefighters were allowed to be present at step 2, for no apparent reason which permitted an intimidating atmosphere for the grievants to attempt to have a fair hearing.  Coupled with Mr. Rhame's assurance that the UNION was not going to take the matter any further, as conveyed to Plaintiff Baquero and then to myself, it became increasingly apparent that the UNION had no intention of pursuing the matter to step 3, or to arbitration for that matter;  thereby resulting in our clients' reasonable belief, as relayed to Mr. Pilacek and myself, that no other recourse existed but to retain our firm counsel. In fact, our firm was engaged initially for the purpose of advancing the matter to step 3, with the retainer agreement executed on March 6, 2000 (the same date as the GAB hearing); with the retainer for filing the federal law suit executed, separately, on February 13, 2001.

27.   LOCAL 2057 and, in particular, Mr. Rhame's hostility towards the Plaintiffs, was further revealed at the GAB hearing, and appeared to solidly establish that the UNION "failed to advance the Plaintiffs' grievance to arbitration."  Specifically, Mr. Rhame was present and, to the best of my recollection, even testified at the GAB hearing.  Following the step 3 hearing, Mr. Rhame approached me and angrily lashed out at me for advocating on behalf of the Plaintiffs' to the GAB that they had been the subject of unlawful race discrimination, and that the UNION had played a significant role in the promotional examination; an examination that, by the date of the GAB

-12-

hearing, had been determined to have had an overwhelming disparate impact. Dr. Hoffman's report and our clients' initial charge of discrimination based upon race discrimination against the COUNTY, were even introduced as exhibits at the GAB hearing. Therefore, for Mr. Rhame to assert in his Affidavit (attached to Doc. 61) that he was "unaware of _any_ charge" of discrimination is blatantly untruthful. (See Rhame Aff. attached to Doc. 61, ¶26 at pp. 14-15.)

28. Furthermore, in its Order granting summary judgment, this Court raises the issue of Mr. Pilacek not securing an affidavit from me to refute Mr. Rhame's assertions in Mr. Rhame's deposition and affidavit. (See Doc. 129, p. 26). Mr. Pilacek knew, however, that I was employed with Akerman Senterfitt, P.A (which represented the COUNTY), and who had agreed to screen me from the matter following an execution of conflict waivers by all concerned parties.. Most importantly, however, Mr. Pilacek and I reasonably believed that Mr. Rhame's letter (Ex. "B-3" to my Declaration) constituted an admission against interest under on the issue of LOCAL 2057's refusal to permit the Plaintiffs' grievance to proceed to arbitration.

29. The Court criticized Plaintiffs and Mr. Pilacek in its Order Granting Summary Judgment (Doc. 129) for failing to point out evidence contradicting Mr. Rhame's assertion that he believed the grievance had no merit. However, again, Mr. Rhame was made aware by Plaintiffs' during the grievance process of Dr. Paul Hoffman's opinions regarding alternative testing methods that would have less of an adverse impact. (see Doc. 73, Ex. "F"), and aware that one of the very exhibits (Plaintiffs'/Grievants' Exhibit "16" at the GAB proceeding) introduced by me before the GAB was the Plaintiffs' Charge of Discrimination filed against the COUNTY on March 3, 2000. Furthermore, this Court also acknowledged in its summary judgment Order that Mr. Rhame and LOCAL 2057's Vice President, Saunders, "both attended the stage 3 grievance proceeding [and] knew that Perry

-13-

[and all Plaintiffs] were claiming race discrimination in connection with the lieutenant's test." (See Doc. 129, p. 30). This demonstrates that Mr. Rhame's assertion that he believed the grievance had no merit was contradicted by evidence known to him (through the GAB hearing) before he made the decision not to allow Plaintiffs to proceed to arbitration, which Mr. Pilacek and I believed raises an inference of intentional discrimination.

30.    After reporting the findings of the GAB hearing to Mr. Pilacek in late March, 2000, I was aware that the Plaintiffs had a short window of time within which to request that the matter proceed to the final stage in the grievance process; namely, arbitration, pursuant to Article 17.07 of the agreement.   Following discussions with Mr. Pilacek, I was also made aware of the fact that the right to pursue arbitration was governed solely by the terms of the agreement, which was a right retained by the COUNTY and the UNION; and, therefore, only the UNION could request that the matter proceed to arbitration.  Accordingly, and based on the instructions of Mr. Pilacek to request that the UNION pursue the matter to arbitration or, in the alternative, to merely request arbitration as the "gate keeper" and to thereby stand aside and allow our clients/Plaintiffs to pursue the grievance at their own expense, I had a telephone conversation with Mr. Rhame on April 6, 2000.

31.    During my conversation with Mr. Rhame, and completely contrary to his sworn Affidavit, I did not inform him at any time that our firm was "not going to take the case any further… [and] not going to continue representing the grievants [our clients] because they could not afford to pay [our] firm." (See Doc. 202, p. 24 quoting Rhame Aff. attached to Doc. 61). It is simply preposterous to believe that I would have disclosed such confidences and made such a remark to someone who had revealed himself to be an adverse party based on his hostility at the GAB hearing towards me personally (as Mr. Rhame admits), as well as reflected in the UNION's vote (through

-14-

Saunders) to vote to deny the grievance at the hearing.

32.  In truth, Mr. Pilacek and I discussed, along with our clients, the UNION's role and the possibility of filing a charge against the UNION for a breach of their duty of fair representation ("DFR") by failing to pursue the grievance to arbitration. Therefore, Mr. Pilacek and I discussed the purpose of my call ahead of time, whereupon I was tasked with requesting the UNION to consider two options: (1) *either* take our clients' grievance to arbitration; *or* (2) to request arbitration *on behalf of* our clients, who would  then pursue the matter at their own expense. I was even told by Mr. Pilacek to offer (which I did to Mr. Rhame, to the best of my recollection, during our conversation on April 6, 2000) that, in consideration for the UNION's assistance to our clients in *being the only avenue to advance their grievance*, our clients would agree to not file a charge against the UNION, nor take any action of any type against the UNION for that matter. I specifically recall Mr. Rhame being concerned to the point of asking me if our clients intended on pursuing a claim or charge against the UNION, which resulted in my mention of the above offer. This version of the conversation is further corroborated by the fact our clients had NOT filed any claim or charge against the UNION as of the date my conversation with Mr. Rhame, as the Plaintiffs maintained hope that the matter *would* proceed to arbitration. Only after the UNION took the position that it did, in not only failing to advance the grievance to arbitration, but in even permitting the Plaintiffs to proceed at their own expense, was a charge of discrimination eventually filed on August 8, 2000.

33.  Mr. Rhame  refused either option, during a telephone conversation, whereupon  I requested a letter simply for further corroboration so that, ironically, there would <u>not</u> be any misunderstanding.  To that end, following my conversation with Mr. Rhame on April 6, 2000, I drafted and faxed my own letter (attached as Exhibit "B-2"), which essentially mirrors Mr. Rhame's

letter of the following day, April 7, 2000. (See Exhibit "B-3" attached.) The letter from Mr. Rhame's expressly states that the UNION "will not pursue [the] grievance … to arbitration…[but also] we [i.e., the UNION] are not in support of the individuals involved proceeding to arbitration." The UNION's position clearly indicated that they would not only <u>not</u> pursue the grievance for the Plaintiffs, but also would not even *request* that the Plaintiffs be permitted to proceed on their own under the agreement. The letter constituted, in my opinion, and I believe Mr. Pilacek as well following our receipt and discussion of the letter, an admission against interest under the Federal Rules of Evidence. Moreover, it appeared to be a clear indication of the UNION's racial animus against our clients; particularly following my several meetings and discussions with a <u>white</u> firefighter, Tom Sawyer, who informed me, as well as testified at the GAB proceeding, that Mr. Rhame and the UNION had pursued his grievance regarding issues over the <u>same</u> promotional examination.

34. Finally, the assertion or at least the implication by Mr. Rhame in his affidavit that he was somehow misled regarding the purpose of my call and request for the letter is undercut by the fact that I sent my OWN essentially identical letter, as well as Mr. Rhame's own deposition testimony where he acknowledges that I did not instruct him as to what to say in the letter. Mr. Rhame's versions are disingenuous and self-serving. (<u>Compare</u> Rhame Aff. attached to Doc. 61 at ¶ 24 to Rhame Depo.p.96,1,22-23 attached hereto as Ex. "B-4"). In sum, Mr. Rhame's version of our conversation is simply inconsistent and, therefore, not credible. Moreover, had the UNION either pursued the Plaintiffs' grievance to a *neutral* arbiter (for which the GAB fell woefully short), or *allowed* our clients to proceed to the arbitration stage, I would not have been in favor of, and I believe that neither would Mr. Pilacek, have agreed to accept representation of the Plaintiffs to

pursue the federal lawsuit.

35.   Following the ruling by the GAB on March 23, 2000 (although the notification from the GAB is March 28, 2000), I retained a glimmer of hope that the COUNTY would actually permit the matter to proceed to arbitration.  As a result, and despite Mr. Rhame informing me verbally, and then by letter on April 6 and 7, 2000, I prepared and forwarded a letter by hand delivery to Ajit Lalchandani, County Administrator, on April 6, 2000; with a copy of the letter attached as "Exhibit D."  Disappointingly, although predictably, Deputy COUNTY Attorney Jeff Newton replied by way of letter on April 11, 2000 (a copy of which is attached as Exhibit "B-5"), stating in relevant part:

> The terms of the collective bargaining agreement with the International Association of Firefighters, Local 2057 ("The Union") provides that only the Union may advance a grievance to arbitration.  Since the Union has advised you it will not seek arbitration of your clients' grievance, the County cannot unilaterally advance the grievance to arbitration.

See "Exhibit B-5" hereto.

36.   It should be noted that the very fact that I was still seeking to permit our clients to proceed to arbitration, per a request made upon the COUNTY, further illustrates the falsity of Mr. Rhame's contention that I allegedly claimed to him during our telephone conversation that our firm was no longer going to represent the Plaintiffs.

37.   Furthermore, I forwarded two letters, dated March 8, 2000 and June 8, 2000, to former COUNTY Chairman Martinez expressly imploring him to intervene and advising him of the fact that a Charge of Discrimination had been recently been filed against the COUNTY.  A copy of the March 8, 2000 letter is attached hereto as "Exhibit B-6," while a copy of the June 8, 2000 letter is attached as "Exhibit B-7."  Notably, in the March 8th letter, I went into great detail with former Chairman Martinez by serving him with a copy of Dr. Hoffman's report, his CV, as well as an article concerning a recent court decision from the Third District Court of Appeals, <u>Lanning v South</u>

Eastern Pennsylvania Transportation Authority ("SEPTA"), 181 F.3d 478 (3d Cir. 1999)  in an attempt to illustrate and refute the claims by the COUNTY's retained test administrators and designers, BRI, that there was no disparate impact.  Amazingly, BRI had claimed there to be no disparate impact, despite the clear statistical evidence to the contrary.     I pointed to former Chairman Martinez the analogous facts in the SEPTA case to the situation within the COUNTY, and in that an arbitrary cut-off score had been set for the first 3 components in a 4 component examination (i.e. a cut off at 60 in the instant case), with no demonstration by BRI, the COUNTY or the UNION that persons below the arbitrary cut off would not be qualified, or as qualified as those within the top 60.

38.  Most notably, I pointed to the fact that all candidates should have been given the chance to complete all 4 portions of the test since it is without dispute that an applicant could have performed much better on the 4th part of the examination and could have perhaps moved into the top 60; particularly when the candidates were separated by a fraction of a point.  (See p. 2 of attached Exhibit "B-6".)  I even pointed to the flaws with 60 being a cut off threshold as it had become apparent that many more promotions would be made beyond 30 (using the BRI formula of approximately doubling the cut off to the anticipated available promotions).  In fact, the arbitrary cut off was shown to be flawed by the fact that all of the individuals on the list were eventually promoted.  In other words, the cut off score (if there should have been a cut off score at all), should have been at approximately 120, rather than 60 under the "doubling" principle. I also pointed to the fact that the test itself did not match the job posting of May 28, 1999 in that parts 2 and 3 of the exam tested matters outside of the four sources of test materials, according to our clients. (Id. at p. 4 of Exhibit "B-6" hereto).  I even pointed to the fact that material that was mentioned in a workshop

held over two days was also admitted as source material, an apparent violation of §23.04 of the collective bargaining agreement , as the workshop was held within 120 days of the test examination dates.  Id.  I further pointed to the fact that there had been no challenge process in place before the examination regarding parts 2 and 3 of the exam which was only put in place after the examination; in violation of §23.10(c) of the collective bargaining agreement. Id.   Finally, the purpose of my letter to former Chairman Martinez was because I had reasonably suspected that the GAB would deny the grievance because the GAB was comprised of those with a self-interest in seeing that the promotions proceed forward; with the GAB being comprised of management representative, a UNION officer (Vice President Saunders, who would have to answer to 59 white firefighters if he voted in favor of the grievance), as well as a COUNTY employee serving as chairperson of the GAB.  Therefore, we requested, in anticipation of an adverse determination of the GAB that should the GAB decline to set aside the exam results, for the former Chairman's intervention in holding the announced promotions, pending judicial resolution. Id.  This appeared to be a reasonable solution as it would allow those individuals to continue to receive lieutenant's pay while remaining in an "acting" lieutenant capacity while the legitimacy of the examination was judicially resolved.

39.  My second letter to former Chairman Martinez of June 8, 2000, (attached as Exhibit "B-7"), again sought the former Chairman's assistance in bringing about a resolution as a Charge of Discrimination had been filed against the COUNTY (but not against the UNION as of yet),  and it was still some eight months before the federal lawsuit was filed.  I addressed and brought to the former Chairman's attention the table of reasonable alternatives proffered by Dr. Hoffman, which had been essentially ignored by BRI, the COUNTY and the GAB, in an effort to again bring about some sort of amicable resolution.

**(c)   "arguing that the Plaintiffs had standing to challenge to eight-year TIG requirement."**

40.   I was no longer employed with Mr. Pilacek as of the date when the COUNTY challenged the Plaintiff's standing, which I am told occurred in the COUNTY's Motion to Strike Plaintiffs' Claims.   Therefore, I am unable to respond to the thought process engaged in by Mr. Pilacek in responding to the COUNTY's arguments after my departure date.

41.   With regard to the disparate impact claims against both the COUNTY and the UNION in regards to the eight-year TIG requirement, it was the collective view of the Plaintiffs, Mr. Pilacek and myself that the UNION's advocacy of the requirement as adopted by the COUNTY commission (only by a 3-2 vote) had the effect of disproportionately restricting the pool of eligible candidates, helping to account for the small sample size of those who actually took the test, as well as contributing to the disparate impact  in our estimation; which we further believed was corroborated by and supported by the report of Dr. Hoffman. Mr. Pilacek, the Plaintiffs and I believed that, although our clients/Plaintiffs met the eight-year TIG themselves, the relief being sought (a re-administration of a promotional examination with reasonable alternatives in place to attempt to have a less disparate impact) would have removed the harm and that the asserted injury (i.e. a promotional examination process with a disparate impact) being due, in large part, as a result of the UNION's assistance upon the eight-year TIG.  While I did not discuss specific cases with Mr. Pilacek in this regard as I left the legal analysis largely up to him, I nonetheless concurred with the aforementioned analysis and I concur with the legal authority and analysis that Mr. Pilacek has sited  in his Declaration.

42.  Furthermore, and to the best of my recollection, neither the COUNTY or the UNION had filed any sort of pleading or motion, nor do I recall any substantive verbal or written

correspondence from counsel for the COUNTY or the UNION which asserted a challenge against our clients having standing.  Therefore, and once again, it is my understanding that these arguments were raised only after my departure from Mr. Pilacek's firm.

**(d)  "Relying on unsubstantiated assertions of plaintiffs and the speculative opinions of their expert," and "continu[ing] to pursue the disparate impact claim even after        the close of discovery - the point at which [counsel] should have realized that the        claim was devoid of evidentiary support."**

43.  Please see my comments and analysis set forth at ¶¶ 10 and 11, as well as the arguments and legal analysis of Mr. Pilacek set forth in his Declaration, as if set forth herein.  Once again, Dr. Hoffman was retained <u>prior</u> to a decision by Mr. Pilacek to accept the case for representation.  I had no prior training or experience in the area of statistics and to my knowledge, neither did Mr. Pilacek.  Furthermore, we understood the general need and requirement to have the 1999 promotional examination process analyzed by an expert in the area of statistical analysis and promotional testing.  Dr. Hoffman's CV, which set forth his extensive credentials, training, education and experience (<u>see</u> Doc. 115, Ex. "1") appeared to certainly allay any such fears or concerns as to his qualifications for him to render such an opinion.  Although I attended Dr. Hoffman's deposition on April 25, 2002, which was just a little more than one week prior to my last day being employed with Mr. Pilacek's firm, it should be noted that both the COUNTY and the UNION  were aware of and had copies of Dr. Hoffman's report and  findings long before that date.  At no time following our initial representation of the Plaintiffs for the grievance process in early March, 2000 to and through my last day of employment with Mr. Pilacek on May 3, 2002, did either the COUNTY or the UNION raised any argument that Dr. Hoffman's opinion's were "groundless and speculative" or were otherwise unreliable, in any respect.  While it is true that the COUNTY's subsequently retained expert, Dr. Gerald Barrett ("Dr. Barrett")  critiqued the sample size as being allegedly too small to be

statistically significant, as well as questioned the combination of the minority groups of Hispanics and African Americans for statistical analysis, Dr. Hoffman explained his rationale for such during his deposition, and even supplied separate tables where he analyzed the adverse impact against Hispanics and African Americans as both a combined _and_ separate groups.  (See tables attached to Exhibit 2 to Dr. Hoffman's deposition transcript).

44.    Simply put, both Mr. Pilacek and I were aware, at the time of my departure from his firm that the case appeared to be a matter of highly qualified, but dueling experts, both of whom appeared to be qualified to render their respective expert opinions, but of whom disagreed with each other within the guidelines of the Federal Rules of Evidence.  I saw nothing, nor do I believe did Mr. Pilacek (at least prior to my departure), of significant concern on the basis that Dr. Barrett and Dr. Hoffman had competing opinions as expected; particularly when the significance of the competing opinions appeared to be a question of fact, rather than a matter of law.  Once again, I personally possess no experience in the area of statistics and, based upon Dr. Hoffman's opinion that the methodology that he utilized, including the Chi-square analysis and the Fisher's Exact Test could be done with even a small sample.  We had no reason to doubt his analysis.

44.    In fact, Dr. Hoffman concluded that the Fisher's Exact Test could be done with small samples and still render statistically significant results.  Further, Dr. Hoffman opined that, not only was the sample significant under Fisher's Exact Test, but also under "Chi-Square" and the EEOC's four-fifth's or 80% rule.  Finally, as noted above, even when African-Americans and Hispanics were considered _separately_, statistical results were significant.  By all accounts, it appeared to me that Dr. Hoffman was a credible expert in his field, having been hired by at least five (if not more) California cities, including, for the city of Oakland, an examination for the promotion for fire lieutenants and

captains to the position of battalion chief.  (See Hoffman Depo., pp. 20-21).  Of further significance in my view, and presumably Mr. Pilacek's, was the fact that, based on Dr. Hoffman's background in the area of statistics, he actually had <u>more</u> credibility than Dr. Burroughs, the principal of BRI, who held a PhD. in Industrial Psychology, with his partner, Mr. Rockhill possessing a Masters Degree in Industrial/Organization Psychology.  However, none of the two key principals of BRI, the COUNTY's test designer, possessed the background in statistics, as Dr. Hoffman.  Because of the vast experience and education of Dr. Hoffman, I believed, and I feel that Mr. Pilacek shared the same opinion based upon my discussions with him regarding the positions of the various experts in the case, that there would easily be found a genuine question of fact as to whether the statistical pool in this case was statistically significant, just as Dr. Hoffman had concluded.  At the time of my departure from Mr. Pilacek's firm, I never suspected and I believe that Mr. Pilacek shared the same opinion that the Court would conduct <u>Daubert </u>hearing sua sponte, particularly, where neither the COUNTY nor the UNION had intended Dr. Hoffman's opinions to be "groundless and speculative," or otherwise unreliable.

**(e) "making groundless allegations of historical race discrimination."**

45.  Again, I concur and adopt the legal analysis set forth by Mr. Pilacek  in his Declaration; however, it is to be noted again, that I left the employee of Mr. Pilacek at the time of the issues raised in the summary judgment motions, as well as the positions taken in response to the motions by the COUNTY and the UNION.  I do assert, that based upon a review of the COUNTY's census data as compared to the ratio of the minorities in positions of rank within the COUNTY's Fire and Rescue Division, revealed an overwhelming under-representation of minorities at the ranks of lieutenant and above; as well as the under-representation of minority firefighters as a whole.  In fact,

-23-

and as noted previously, at the time of the promotional exam in 1999, with the approximate 120 lieutenants in the department, there were only 4 minorities and, following the arguably discriminatory exam, the number actually <u>decreased</u> to 4 out of approximately 180 lieutenants.

46.   The above statistical data was construed in conjunction with the fact that former Fire Chief Iacona was terminated in April, 2000, at least in part, according to comments attributed to the media to former County Chairman Martinez, because of the failure to increase "diversity" within the ranks of the COUNTY's Fire and Rescue Division. This fact also led to my reasonable belief that there had been a historical pattern of race discrimination.  In my estimation, the fact that former Chief Iacona was terminated shortly after the instant lawsuit was filed was a tacit admission by the COUNTY that it (the COUNTY) recognized that there had been a history of discrimination, that unfortunately former Chief Iacona was unable to correct.  Furthermore, former Chief Iacona made comments at the impasse hearing on March 30, 1999 where he recognized the under-representation of minorities when he advocated strenuously for adoption of a five year rather than the UNION backed eight-year TIG requirement before being considered for promotion to the rank of lieutenant.

47.   As to the allegation about the COUNTY's role in creating a test based on its known pattern and practice of discrimination in the hiring and promotion of minorities (Doc. 1, ¶23) for which the Magistrate addresses on page 23 of the Report and Recommendation (Doc. 190), it should be noted that I was still attempting to secure documents from counsel for the COUNTY prior to my departure from Mr. Pilacek's firm.  This is verified at page 3 of my April 4, 2002 letter to Deborah Samuels-Gibson, (Exhibit "B-8" attached, and Doc. 115, Ex. B),  wherein station logs had been requested to determine which firefighters had been requested to write out of class.  I had been informed on March 25, 2002 by Rexford Stephens, Esq. of the Akerman firm (on behalf of the

COUNTY) that the records that I had been given were not station logs, but, rather, "battalion logs" (see Exhibit "B-8" p. 3).  As such, and even up to the eve of my departure from Mr. Pilacek's firm, we were still trying to corroborate our Plaintiffs' strong contention that the station logs would support the contention that our clients had been the victims of disparate treatment in the form of not being afforded the same opportunities as their white peers in terms of being permitted to "ride out" or "ride up" as a Lieutenant.  Finally, in his deposition taken by way of written questions, former Chairman Martinez spoke of lawsuits filed by minority firefighters in the early 1990's who believed they were unfairly passed over for promotion as a factor in his decision to advocate a five-year TIG requirement. (See Doc. 101, Plaintiffs' Exhibit 11), p. 8)

> **(f)   "alleging and persisting in the frivolous allegation that Plaintiff Suarez was Hispanic."**

48.   The allegation concerning Plaintiff Suarez' race/ethnicity of being Hispanic came directly from Plaintiff Suarez', as revealed by his execution of the Verified Complaint.  Furthermore, both the COUNTY and the UNION admitted in their respective answers that Suarez was Hispanic.  In addition, the COUNTY even classified Suarez as Hispanic for testing purposes.  Because of the foregoing, but most notably based on the representation by Plaintiff Suarez himself to me, I believed there to be a sufficient basis in fact to make the allegation.  I had no reason whatsoever to doubt Plaintiff Suarez' representation to me that he was Hispanic.

49.   Concerning the fact that Plaintiff Suarez clarified his own perception understanding of his race/ethnicity of being "White/Brazilian" at his deposition, as referenced as addressed at pages 5 – 7 of this Court's Order Granting Summary Judgment (Doc. 129), Mr. Pilacek and I still reasonably believed that we had a  good faith basis for continuing to assert that Plaintiff Suarez was Hispanic for purposes of civil rights litigation.  The accusation that he was not, in fact, Hispanic was first

brought to my attention in a letter from Deborah Samuels-Gibson, Esq. on behalf of the COUNTY, for which I responded by letter of April 4, 2002.  (See Exhibit "B-8".)

50.     It should be noted that, as soon the allegation was brought to my attention by virtue of Ms. Samuels-Gibson's letter of March 6, 2002, I immediately addressed the matter, not only with our client (Plaintiff Suarez), but also discussed the situation with Mr. Pilacek; who advised me that if we could not support the contention that he was Hispanic, we would drop the matter.  I thereafter spent time researching the issue and drafted a letter (i.e., the attached Exhibit "B-8"), for which I had Mr. Pilacek review prior to its transmittal to opposing counsel.   Based upon what I reasonably believe to be a good faith position to continue to assert that Plaintiff Suarez was Hispanic (and notwithstanding his own self-identification as "white Brazilian"), on the case authority cited in my letter.  See Peightal v. Metropolitan Dade County, 26 F.3d 1545 (11th Cir. 1994) (recognizing the County's adoption of the EEOC definition of Hispanic to include "all persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race) and Cardona v. American Express Travel Related Services Company, Inc., 720 F.Supp. 960 (S.D. Fla. 1989).   I relied on the aforementioned authority and I presume that Mr. Pilacek did as well based upon his review of my letter prior to sending it Ms. Samuels-Gibson, to formulate a good faith basis for believing that there was authority (and based upon the COUNTY's admission and classification of Plaintiff Suarez as Hispanic a factual basis) for continuing to assert that Plaintiff Suarez was Hispanic.  Between the month of April 4, 2002 and my departure from Mr. Pilacek's firm on May 3, 2002, neither the COUNTY nor the UNION pursued a Rule 11 claim, nor was I ever furnished with a motion threatening such sanctions, nor provided a "safe harbor," pursuant to Rule 11(c)(1)(A), Fed. R. Civ. P.  It should also be noted that counsel for the UNION was sent a copy of my letter of

April 4, 2002.  (See, p. 6 of Ex. "B-8").

**(g)  "bringing and persisting in a frivolous retaliation claim against the Union."**

51.     The retaliation claim centers upon the UNION's treatment of Plaintiff Perry, and was based upon what Mr. Pilacek and I believe to be a prima facie case of retaliation based upon the fact that Plaintiff Perry engaged in protected participation or opposition of conduct by filing an EEOC charge (on behalf of himself, the other Plaintiffs and others similarly situated) against the COUNTY regarding the 1999 promotional examination.  In addition, Plaintiff Perry suffered an adverse action in the form of being denied membership to the UNION based upon the UNION's proffered reason that Plaintiff Perry was not admitted because of his outstanding grievance and EEOC claim against the COUNTY.  In fact, Plaintiff Perry was not admitted to the UNION until approximately late in the year of 2001, more than a year following the UNION's stated reason for not admitting him (i.e., based upon his grievance against the COUNTY).  The third prong of the retaliation test is a causal connection, which is premised upon the employer (or in this case, the UNION as a labor organization) having taken the adverse action because of the protected activity.  (See, EEOC v. Reichhold Chems., Inc., 988 F.2d 1564, 1571 (11th Cir. 1993).

52.     Here, the UNION refused to admit Plaintiff Perry into its membership until late in the year 2001, after Plaintiff Perry had filed his EEOC charge against the COUNTY on March 3, 2000. The second prong of the prima facie analysis was met because the UNION knew that Plaintiff Perry had filed an EEOC charge against the COUNTY on March 3, 2000 when both Mr. Rhame and Union Vice-President Saunders were present at the GAB hearing; and it was only after the filing of the EEOC charge that the UNION made its decision to deny admission to Plaintiff Perry.  This denial, by my recollection, was revealed through meeting minutes for the months of March and

April, 2000 of the UNION which stated that the proffered reason for Plaintiff Perry's denial of membership was ostensibly because of his outstanding grievance and the UNION's purported policy of not admitting such individuals.  The UNION was also placed on notice about Plaintiff's Perry's retaliation charge when Plaintiff Jackson filed an EEOC charge against the UNION on behalf of himself, the other Plaintiffs (including Plaintiff Perry), and other similarly situated individuals on August 8, 2000.  Nevertheless, Plaintiff Perry was denied Union membership for more than a year following August 8, 2000.  Plaintiff Perry's application was apparently moved for admission in March, 2001.  It is undisputed that Plaintiff Perry was still not admitted to the UNION until late 2001.  In short, the decision to finally admit Plaintiff Perry into membership was made long after the March 28, 2000 denial of Plaintiff Perry's grievance; more than a year after the UNION had decided not to proceed with arbitration; and even more than one year after the point in time that the UNION became aware of Plaintiff Perry's complaints against it through the EEOC charge filed by Plaintiff Jackson on behalf of Plaintiffs Jackson, Perry and the other Plaintiffs.  The UNION continued to deny Plaintiff Perry's application for membership nonetheless.

53.  In our estimation and legal analysis, Mr. Pilacek and I believed that the foregoing was sufficient to create an issue of fact as to whether the UNION's proffered explanation, for an alleged "policy," was merely a pretext for retaliation; or at the very least created a disputed issue of fact.  In the estimation of myself, the Plaintiffs and, I presume, Mr. Pilacek as well, the fact that the proffered reason was merely a pretext for retaliation was also solidified by the UNION's refusal to pursue the grievance to arbitration, or to even permit the Plaintiffs (including Plaintiff Perry) to proceed to arbitration at their own expense.

**(h) "relying on unsubstantiated assertions of plaintiffs and the speculative opinions of their expert," and "continu[ing] to pursue the disparate impact claim even after the close of**

**discovery – the point at which [counsel] should have realized that the claim was devoid of evidentiary support.”**

54.   Please see my analysis as to the assessment of Dr. Hoffman's expert opinion under section (d), <u>supra</u>.  Again, because I left the employ of Mr. Pilacek's firm as of May 3, 2002, I am unable to comment upon any decision made to continue with the disparate impact claims following the close of discovery that occurred  one month prior to my departure.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of July, 2004.

      /s/Gary D. Wilson
Gary D. Wilson, Esquire
Fla. Bar No.:846406
Jill S. Schwartz & Associates, P.A.
180 Park Avenue North, Ste. 200
 Winter Park, FL  32789-7401
 407-647-8911
 407-628-4994  facsimile
 gwilson@schwartzlawfirm.net